Stephen H. MUSE, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 428–86C.

United States Claims Court.

Oct. 19, 1990.

Neil B. Kabatchnick, Washington, D.C., for plaintiff.

John S. Groat, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This military pay case is before the court on cross-motions for summary judgment. Jurisdiction is premised on 28 U.S.C. § 1491(a)[1] and 10 U.S.C. § 1552(a).[2] Plaintiff, Captain (CPT) Stephen H. Muse (Muse), is a former officer who was given an involuntary honorable discharge from active duty in the United States Army in 1983 after having been passed over for promotion to the rank of permanent major in the Regular Army (RA) on at least two occasions. Muse contends that these passovers, and thus his subsequent involuntary discharge from active duty status, were precipitated by a defective Officer Evaluation Report (OER), *i.e.*, one that was purportedly prepared in violation of Army Regulation (AR) 623–105.[3] Consequently, he seeks an order invalidating that OER, restoration to active duty, back pay, and any other relief that may be warranted to correct the alleged wrongful separation from the service.

The United States, acting through the Department of the Army (defendant), contends that the OER was not defective, insofar as it was prepared in accord with the requirements of AR 623–105. Thus, based

---

**1.** 28 U.S.C. § 1491(a) provides in part:
(1) The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department....
(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States....

**2.** For the relevant text of this statute, *see* note 25, *infra*.

**3.** AR 623–105 (effective July 15, 1976, and as amended August 1, 1978), styled "Personnel Evaluation, Officer Evaluation Reporting System," governed the preparation of the OERs in issue here.

on the efficacy of the OER in issue, the defendant argues that the promotion passovers, and the resulting involuntary discharge, were valid and in accord with law. For the reasons discussed hereinafter, the plaintiff's motion is GRANTED and that of the defendant is DENIED.[4]

*Facts*

Muse graduated from the United States Military Academy at West Point in 1970, after which he was commissioned as a Second Lieutenant in the RA. He served with distinction in Vietnam and in other assorted assignments over the next four years. Over this period, he received regular promotions, attaining the rank of temporary captain in the Army of the United States (AUS)[5] on June 3, 1974. On May 13, 1974, while a first lieutenant, Muse was among a select group of 25 sericemen who received appointments to attend law school at the defendant's expense under the Funded Legal Education Program (FLEP). Muse received a masters degree in business administration from the University of Hawaii on August 17, 1974. Subsequently, Muse obtained his Juris Doctor from Brigham Young University on April 22, 1977. Shortly afterwards, on June 3, 1977, he became a permanent captain in the RA. Muse was then assigned to the Judge Advocate General (JAG) Corps, where he served as an Army attorney, in various capacities, for the balance of his active duty commission.

Over the course of his career in the Army, Muse, like all commissioned officers, was subject to periodic OER performance reviews.[6] These evaluations are designed to provide:

> ... a continuing appraisal of each officer's performance of duty in various assignments, as well as an assessment of potential to discharge duties associated with positions of increased responsibility. *The report serves as the primary source of information for such personnel actions as promotion,* designation for troop command/key managerial duties, selection for schooling, *continuation on active duty, RA integration, and assignments necessary for appropriate career development.*

AR 623–105 ¶ 1.2(a) (August 1, 1978) (emphasis added).

The dispute at bar is essentially grounded on the numerical scoring, the adjectival rating, and the related narrative comments Muse received on an OER covering the rating period of April 18, 1978 through April 17, 1979. During that time, Muse was in his second JAG assignment following his graduation from law school,[7] where he was serving as an Assistant Trial Counsel to the Staff Judge Advocate (SJA) at Fort Sill, Oklahoma. In that capacity, his primary duties included the prosecution of general court-martials, special court-martials, and advising military personnel on matters involving criminal law and the ad-

---

4. This is the *second* opinion we have issued in subject case. In *Muse v. United States,* 13 Cl.Ct. 372 (1987), we denied the defendant's motion for summary judgment that was based on the equitable doctrine of laches. Unfortunately, at the time of the laches motion, *neither* party averred an alternative motion for summary judgment on the merits. We observe that such failure, in this record review case, caused the court to improperly utilize its time by fragmentarily addressing two separate summary judgment motions. Had alternative motions for summary judgment on the merits been filed by the parties to the laches motion, this court could have issued a *dispositive* ruling in 1987. This, in turn, would have saved the court and the parties a *tremendous* amount of time and litigation expense. Litigants should always be sensitive to both the efficient use of judicial resources and the needs of their clients in drafting dispositive motions in such cases.

5. Promotion to a temporary rank in the AUS typically precedes promotion to a permanent rank in the RA.

6. Generally speaking, OERs are required on an annual basis. AR 623–105 ¶ 2.2(a) (August 1, 1978). If an officer changes assignments prior to the expiration of one year, that officer will receive an OER if he/she spent at least 90 rated duty days in a single principle duty assignment under a single rater. *See* AR 623–105 ¶ 2.2(c) (August 1, 1978).

7. Immediately following graduation, Muse spent four months completing the Judge Advocate Officer Basic Course. His first JAG Corps assignment was as a Legal Assistance Officer at Fort Sill, Oklahoma, from October 10, 1977 through April 17, 1978.

ministration of military justice. At the end of this rating period, April 4, 1979, Muse was evaluated by two superiors, one designated as the "rater" and the other as an "indorser." Said persons independently reviewed his duty performance as Assistant Trial Counsel. In fact, their evaluations of Muse were recorded for said rating period on the standard OER form in effect at the time, DA Form 67–7. That form, and thus the OER in issue here, contained 10 parts, five of which are relevant to and probative of this matter. These include Part IV, "Professional Attributes," Part V, "Demonstrated Performance of Present Duty," Part VI, "Potential," Part VII, "Comments," and Part VIII, "Report Scores."

With respect to the "Professional Attributes"[8] demonstrated by Muse *as an Assistant Trial Counsel,* the rater, Lieutenant Colonel (LTC) John Turner, indicated that Muse "needed some improvement" in four areas. These noted areas of needed improvement included technical competence, Part IV(a)(2), reliability of judgment, Part IV(a)(7), the subordination of personal interests to that of the organization, Part IV(a)(11), and personal conduct as an example for subordinates, Part IV(a)(12). By way of explanation for these marks in Part IV(b), the rater stated:

[Part IVa] 2, 7: Officer's knowledge of military criminal law and procedure is deficient; his ability to gather relevant facts and research the law is substandard.

[Part IVa] 11, 12: Officer occasionally neglected his military duties to concentrate on off-duty business activities. Of-

ficer was counseled on the noted attributes.

In Part V of the OER, the rater, LTC Turner, and the indorser, Colonel Edward A. Lassiter, rated plaintiff's demonstrated performance of duty. The rater assigned a score of 60 out of a possible high of 70, (*i.e.,* 60/70), while the indorser assigned a somewhat higher score of 66/70. Both of these scores carry a corresponding adjectival descriptive rating of "superior."[9]

As for the "Potential" shown by Muse, the rater, in Part VI(a)(1) of the OER, stated that plaintiff performed best in the capacity of providing legal assistance to clients.[10] The rater further suggested, in Part VI(a)(2), that a "[t]ransfer from JAGC to Infantry Branch for duties as an Infantry Officer" would be an assignment in which Muse could make his greatest contribution to the Army. Based on the foregoing, and on their own independent judgment, both the rater and the indorser were required, in Part VI(b), to assign a numerical rating on the promotability of CPT Muse.

With respect to this issue, the rater indicated that he would promote Muse *"with his contemporaries"* (emphasis added) giving him a score of 23/30. The indorser again scored Muse somewhat higher with a 24/30, which resulted in a recommendation that he be promoted *"ahead of his contemporaries"* (emphasis added). Passing Part VII for the moment, in Part VIII, "Report Scores," all of the numerical ratings assigned by both the rater and the indorser were tallied to compute the overall numerical score. In other words, this total included the Part V "performance" scores (60 from the rater and 66 from the indorser)

---

8. Under Part IV, the rater must index the degree to which a rated officer possesses 16 "professional attributes." For each of these 16 questions, the rater must score the rated officer, by placing an "X" in one of four boxes, to indicate whether (i) the officer possesses the noted attribute, (ii) the officer needs "some" improvement in the noted attribute, (iii) the officer needs "much" improvement in the noted attribute, or (iv) the officer lacks the noted attribute. *See generally* AR 623–105 ¶ 4.3(e) (August 1, 1978).

9. According to AR 623–105, ¶ 4.3(f)(4)(b) (August 1, 1978), a "superior" rating such as that

given to Muse "denotes very high quality performance, as well as competence and effectiveness attained by very few officers." A "superior" score is one of six possible ratings in Part V; such ratings are—Outstanding, Superior, Excellent, Effective, Marginal, or Inadequate. *See generally* AR 623–105 ¶ 4.3(f)(4) (August 1, 1978).

10. This statement was later deleted from the OER, *see infra,* because CPT Muse had no duties relating to legal assistance during this April 1978 to April 1979 rating period. Thus, this reference was viewed as an inappropriate comment.

and the Part VI(b) "potential" scores (23 from the rater and 24 from the indorser). When these scores were aggregated, Muse received a total score of 173/200 (83 from the rater and 90 from the indorser).

It is worthy to note that these scores, in Part V and Part VI(b), provide the background and basis for the "Comments" of both the rater and the indorser in Part VII of the OER, which are of particular importance to the operative issues in this case. This is so because both Part V and Part VI(b) contain a common caveat addressed to the rater and the indorser to the effect that they were "required to cite specific examples or illustrations in Part VII to support" these "superior" adjectival and numerical ratings. In this context, the rater, in justifying the numerical scores given in Parts V and VI(b), stated in Part VII(a) that:

> CPT Muse is an extremely ambitious and personable officer who is well liked. He is a good organizer who enjoys and excels in performing legal assistance duties. However, his performance as a trial counsel was erratic. He was frequently criticized for ineffective courtroom performance. He is not a good public speaker and was not always thoroughly prepared in court. The military judge rates him as one of the poorest trial counsel he has seen, though he notes some recent improvement in his performance.[11] He was overly involved in off-duty business activities (real property development and investment) which adversely affected his duty performance.

(emphasis added).

Similarly, in Part VII(b) of the OER, the indorser evaluated Muse in the following manner:

This officer is forceful, aggressive, and takes charge of the situation. Intellectually he is far superior to his peer group in both law and military science. He is not articulate in responding to counsel in the forensic environment. He is not comfortable when required to think quickly on his feet. His trial preparation requires further development. He plans ahead. He organizes his effort. He works well with counsel and commanders. He is productive. He is physically fit and morally straight. He is an administrator and is best utilized in that role.

Subsequent to this rating period, Muse was reassigned to the Legal Assistance Section.[12] In 1980 he became eligible for promotion to the rank of *temporary* major in the AUS. However, he was passed over on March 14, 1980, by an Army promotion board. Muse was again passed over for promotion to the rank of *temporary* major the following year, on July 15, 1981. After this second passover, Muse apparently decided to appeal the validity of the numerical scores/adjectival ratings and narrative comments in the OER.

Therefore, on November 10, 1981, he filed his first challenge to the April 18, 1978–April 17, 1979 OER with the Army Military Personnel Center (MILPERCEN), alleging that it should have been *invalidated* on the basis of "substantive inaccuracy" and that the period should have been declared non-rated. This appeal was returned on December 1, 1981, for revision due to insufficient evidence. Muse refiled his OER appeal with MILPERCEN on April 1, 1982,[13] having modified it to include assertions of both administrative er-

---

11. The underlined language was later deleted from the OER because, following an appeal by Muse, it was determined by the appropriate military authorities that the rater hospitably exaggerated the statements of the military judge. *See infra.*

12. CPT Muse served as a Legal Assistance Officer for approximately the next two years. Sometime in 1981, he became the Chief Legal Assistance Officer at Fort Sam Houston in Texas. Until he was involuntarily discharged from active duty in the service on September 30, 1983, Muse remained in this post.

13. On February 18, 1982, Muse filed an appeal on an OER he received for the subsequent rating period covering April 18, 1979 through October 31, 1979. In that appeal, plaintiff sought to delete certain references to his off-duty activities and involvement in commercial real estate development. This appeal was granted by the Army Special Review Board, and the offending language in Parts IV(a), IV(b), and VII(a) was deleted by an order dated June 15, 1982.

ror and substantive inaccuracy. He again sought to have the OER invalidated, and to have the period non-rated.

In this appeal, Muse generally alleged that the OER was not prepared in compliance with the *mandatory* procedures outlined in AR 623–105. He argued that the comments of the rater and the indorser in Part VII, while derogatory, were required to reflect "specific examples" supportive of the numerical ratings. That is to say, plaintiff asserted that AR 623–105 required a symmetry between the numerical/adjectival ratings and the narrative comments. In particular, he argued that the numerical scores/adjectival ratings were too high, as demonstrated by the *inconsistent* correlation between "superior" ratings of performance in Part V on the one hand and the related derogatory narrative comments in Part VII on the other. Moreover, in view of those derogatory comments, Muse alleged that the OER was *in fact* "adverse" within the contemplation of AR 623–105. Additionally, he argued that the regulatory procedures governing an "adverse" OER, the most significant of which included *the right to submit a reply for incorporation in his personnel file, were not followed.* This failure allegedly deprived Muse of the fundamental due process guarantees of the regulation, as well as the basic right to respond to accusations by explaining the situation so as to ameliorate the adverse impact of the OER. Muse further averred that the narrative portions of the OER also contained substantive inaccuracies, insofar as they reflected exaggerations, overstatements, and, more importantly, failed to consider any appropriate mitigating factors.

MILPERCEN forwarded the OER appeal to the Department of the Army Special Review Board (SRB) for consideration, apparently because it viewed the claims of substantive inaccuracy as providing the primary basis for the petition.[14] At nearly the same time Muse filed his OER appeal with MILPERCEN, he independently pursued a reconsideration of his 1980 and 1981 passovers. In this endeavor, Muse, on April 7, 1982, filed a request with the Army seeking promotion reconsideration on grounds unrelated to his OER appeal.[15] This request was approved on April 19, 1982. Action on this petition was stayed while the OER appeal was underway. In the meantime, on May 27, 1982, Muse was passed over again, this time for the more critical promotion to the rank of *permanent* major in the RA.

On August 3, 1982, the SRB rendered its decision on the OER appeal, granting only partial relief. The SRB concluded that, while Muse had provided sufficient information to warrant two remedial corrections, he did not offer sufficient information to justify an invalidation of the entire OER. Thus, in granting partial relief, it ordered (i) that the rater's statement—that Muse performed best in providing assistance to clients—be removed from Part VI(a)(1) because plaintiff had no legal assistance duties during the rated period, and (ii) that the following critical comment attributed to the military judge be excised from Part VII(a) because it was an unsubstantiated overstatement:

> The military judge rates him as one of the poorest trial counsel he has seen, though he notes some recent improvement in his performance.

**14.** According to AR 623–105 ¶ 8.5(b) (August 1, 1978), MILPERCEN screens claims to separate those based on administrative error from those based on a claim of substantive inaccuracy. Claims based on administrative error, that is, those that claim error in Parts I, II(a)–(c), VIII, IX, or X of DA Form 67–7, *see* AR 623–105 ¶ 8.5(c) (August 1, 1978), are resolved by MILPERCEN. Claims based on substantive inaccuracy, that is, those that claim error in Parts II(c), III, IV, V, VI, or VII of DA Form 67–7 (generally described as claims founded on allegations of inaccurate appraisal of performance

or potential due to either an erroneous perception of performance by the rating officials or a lack of objectivity induced by bias or prejudice), *see* AR 623–105 ¶ 8.5(d) (August 1, 1978), are forwarded to the SRB for adjudication.

**15.** Muse based his request on the fact that he had been considered for promotion under JAG Corps standards, when he was in fact an Infantry Officer temporarily detailed in the JAG Corps. Also, his records did not contain an OER covering a four-month period in 1972.

The SRB further determined that these recommended corrections did not warrant promotion reconsideration by the Department of the Army Special Selection Board (SSB). Muse was, therefore, notified of the SRB decision to grant only partial relief on August 19, 1982, and was further advised that the report was not "adverse" within the technical contemplation of ¶ 5.2(h), AR 623–105. Because of the foregoing, the SRB concluded that said report was not required to have been referred to him for comment. On August 26, 1982, Muse filed for reconsideration by the SRB, arguing that the partial correction was insufficient, and that the OER should be deleted from his file in its entirety. This request was denied on September 10, 1982.

On that same day, Muse filed an application with the Army Board for the Correction of Military Records (ABCMR), again seeking to void the OER in its entirety due to legal error and injustice and to have the period non-rated. He alleged the same essential grounds for relief as those he had asserted in his appeal before the SRB, *i.e.,* that the OER contained legal errors and injustices because it was not prepared in compliance with AR 623–105. This resulted in an OER that, avers Muse, was intended to be adverse, was perceived as adverse by promotion boards and career managers, and was in fact adverse. However, because the OER was prepared in such a way that it was not given the status of an "adverse" evaluation, Muse argued that he was illegally denied his right to respond under AR 623–105 ¶ 5.2(i). According to Muse, the sum total of the legal errors and injustices resulted in a defective OER that was an unfair appraisal of his ability and potential.

Shortly after the August 3, 1982 SRB decision to grant only partial relief on the OER appeal, and after Muse filed his correction application with the ABCMR on September 10, 1983, two SSBs convened to reconsider Muse for promotion to the rank of temporary major, AUS, under criteria established for both the 1980 and 1981 regularly constituted selection boards, pursuant to plaintiff's April 7, 1982 request for promotion reconsideration. Both boards adjourned in mid-October 1982. However, both the 1980 and 1981 SSBs apparently conducted their consideration of Muse on the basis of records that included the OER as it was originally prepared, even though the SRB had already granted partial relief on the OER appeal. In other words, the *amended* OER was *not* part of the record at the time either of the SSBs considered Muse for a temporary promotion to major under the criteria for 1980 and 1981. Thus, on January 17, 1983, Muse was informed that he had been passed over by both the 1980 SSB and the 1981 SSB. These two passovers constituted the third and the fourth time plaintiff was non-selected for temporary promotion.

Meanwhile, Muse continued to pursue his correction application with the ABCMR. However, at no time did he amend his petition to request the deletion of anything other than the alleged defective OER. That is, he did not ask the ABCMR to expunge from his records the passovers of March 14, 1980 (first passover for promotion to rank of *temporary* major, AUS), July 15, 1981 (second passover for promotion to the rank of *temporary* major, AUS), May 27, 1982 (first passover for promotion to rank of *permanent* major, RA), or January 17, 1983 (third and fourth passover for promotion to the rank of *temporary* major, AUS). He sought only to have the OER deleted from his records and to have the period of April 18, 1978 through April 17, 1979 non-rated.

After being notified on January 17, 1983 that he had been passed over for the third and fourth time, Muse filed a second promotion reconsideration request on March 7, 1983. This petition was based on the fact that, when Muse was passed over for the third and fourth time, the SSB decisions in both reconsiderations were based on records that *did not* include the OER *corrections* ordered by the SRB on August 3, 1982. This reconsideration request was granted, and Muse was again considered, for the fifth and sixth time, for a temporary promotion to major under the 1980 and 1981 criteria.

While the SSB was engaged in these deliberations, Muse became eligible for promotion to the rank of *permanent* major in the RA for the second time. He was passed over on June 3, 1983. By this time he had been passed over for a promotion to *temporary* major in the AUS four times, and twice for a promotion to the rank of *permanent* major in the RA. Subsequently, on June 29, 1983, plaintiff was notified by the SSB that, pursuant to his March 3, 1983 temporary promotion reconsideration request, he was again passed over under the standards applicable to 1981 selections. On September 21, 1983, Muse was informed that he had also been passed over by the SSB under the promotion criteria for 1980. Thereafter, having been passed over twice for a *permanent* promotion to the rank of major in the RA, Muse was involuntarily discharged from active duty on September 30, 1983,[16] pursuant to 10 U.S.C. § 632.[17]

The ABCMR rendered its decision on November 9, 1983. It determined that Muse "failed to submit his application within the time required, to provide sufficient reasons for his failure to do so, or to demonstrate the existence of probable material error or injustice to warrant a formal hearing." It therefore concluded "that there is insufficient evidence to indicate probable material error or injustice." Thus, because it found no errors in need of correction, the ABCMR denied the application. Muse was informed of this action by a letter dated January 17, 1984.

*Contentions*

A. Plaintiff

In his exhaustive pleadings, Muse asserts five interrelated bases for relief. In this connection, CPT Muse contends that:

(i) the OER for the period April 18, 1978 to April 17, 1979, was legally erroneous and unjust, and thus defective, insofar as it was prepared in violation of AR 623–105;

(ii) the 1980 promotion passover was material legal error and unjust, insofar as Muse, due to the presence of the allegedly defective OER in his military records before the 1980 promotion selection board, was not considered on a "fair and equitable basis" pursuant to 10 U.S.C. § 3442(c);

(iii) the subsequent selection board passovers in 1981, 1982, and 1983 also constituted material legal error and were unjust because they were all precipitated by the defective OER and the previous passover(s);

(iv) the SRB's decision to void only portions of the defective OER, *supra*, as opposed to the entire report for the rating period in issue, was material legal error and unjust because it was arbitrary, capricious, unsupported by substantial evidence, and contrary to law; and

(v) the ABCMR's decision to deny relief was material legal error and unjust because it was arbitrary, capricious, unsupported by substantial evidence, and contrary to law.

B. Defendant

The defendant, on the other hand, contends that we should examine only the decision of the ABCMR to determine whether it was arbitrary, capricious, unsupported by substantial evidence, or contrary to law. In this connection, it avers that the issue is simply whether the OER for the period April 1978 to April 1979 contains a clear legal error or errors that should have been corrected by the ABCMR pursuant to the statutory authority in 10 U.S.C. § 1552(a).[18] It relies on the test cited in *Gruendyke v.*

---

16. Muse was commissioned as a captain in the Army Reserve on the same day. He was eventually promoted to the rank of major in the Reserve Corps on April 5, 1985.

17. 10 U.S.C. § 632(a)(1) (1982) provided that: [E]ach officer of the *Regular Army* ... who holds the regular grade of captain or major ... who has failed of selection for promotion to the next higher regular grade for the second time ... shall:

 \* \* \* \* \* \*

(1) be discharged on the date requested by him and approved by the Secretary concerned....

18. *See* note 25, *infra*.

*United States,* 226 Ct.Cl. 193, 195, 639 F.2d 745, 747 (1981), in alleging that Muse has failed to demonstrate, by the required quantum of clear and convincing evidence, that there were any material legal errors in need of correction. Thus, it essentially alleges that the OER in question is *not* defective, and, consequently, the ABCMR's decision to retain it in the records did not violate any of the above-stated standards.

*Scope of the Opinion*

As the predecessor Court of Claims once stated in a similar case, this is "another in the crowded parade of suits by former military officers who have been [involuntarily] separated from the service, denied promotion, or relieved from active duty, allegedly on the basis of [a defective OER]." *Hary v. United States,* 223 Ct.Cl. 10, 13, 618 F.2d 704, 705 (1981). The theoretical underpinnings in such claims often lie in the assertion that the officer concerned was not considered for promotion on the basis of a personnel file that portrayed his or her service career on a "fair and equitable basis," as required under either former 10 U.S.C. § 3442(c) or former 10 U.S.C. § 8442(c), due to the presence of some legal error or injustice in the record before the promotion selection boards. *See, e.g., Engels v. United States,* 230 Ct.Cl. 465–472, 678 F.2d 173, 177 (1982); *Hary,* 223 Ct.Cl. at 19, 618 F.2d at 709; *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 814 (1979). *See also Sargisson v. United States,* 913 F.2d 918, 922 (Fed.Cir.1990), *pet. for reh'g filed* (Sept. 13, 1990) (unlawful discharge petitions based on the "fair and equitable" standards of former 10 U.S.C. § 3442(c) and 10 U.S.C. § 8442(c) are reviewable, and thus justiciable, in the Claims Court).

In a similar vein, Muse contends here that he is entitled to the typical relief prayed for in such cases because the OER in issue, *supra,* was defective, and that the presence of this legally erroneous and unjust OER in his records ultimately portrayed his military career in a manner that did not comply with the "fair and equitable" legal standard enunciated in former 10 U.S.C. § 3442(c).[19] The alleged unfair and inequitable record created by the presence of that defective OER precipitated, in plaintiff's view, unlawful passovers that eventually triggered an illegal discharge. In such circumstances, "federal courts have the power and the duty to inquire whether a military discharge was properly issued under the Constitution, statutes, and regulations." *Sanders,* 219 Ct.Cl. at 303, 594 F.2d at 814, *quoting Matlovich v. Secretary of the Air Force,* 591 F.2d 852 (D.C.Cir.1978). Under this theory then, and pursuant to the statutory criteria of 10 U.S.C. § 3442(c), the overriding issues in this case are—whether CPT Muse was considered for promotion on the basis of a service record that portrayed his military service in a "fair and equitable" manner and, secondly, whether his subsequent discharge was lawful. The resolution of these issues, of course, requires an examination of plaintiff's records presented to the selection board to determine whether the contested portion of that record, the OER of April 1978 to April 1979, contained material legal errors and injustices such that his records were not a "fair and equitable" reflection of his military career.

This same threshold question, *inter alia,* was purportedly addressed by the ABCMR. There, plaintiff contested the legality of the subject OER, arguing, in effect, that, due to various legal errors and injustices, the OER was an unfair and inequitable reflection of his performance as Assistant

---

**19.** Former 10 U.S.C. § 3442(c) provided, in part, as follows:

> ... a regular commissioned officer ... who is serving on active duty, may be appointed in a temporary grade that is equal to or higher than his regular or reserve grade, without vacating any other grade held by him. Under regulations to be prescribed by the Secretary, *appointments made under this subsection shall be made on a fair and equitable basis....*

(emphasis added).

This section was repealed on December 12, 1980. However, the repeal was not effective until September 15, 1981. Thus, 10 U.S.C. § 3442(c) was in effect at the time Muse was considered for his temporary promotions in 1980 and 1981.

Trial Counsel during the subject rating period. The ABCMR, however, refused to order any record corrections, concluding that Muse "failed to submit his application within the time required, to provide sufficient reasons for his failure to do so, or to submit sufficient relevant evidence to demonstrate the existence of probable material error or injustice to warrant a formal hearing." It therefore informed Muse that there was insufficient evidence to indicate probable material error or injustice.[20] Thus, because the ABCMR was the last administrative body to rule on the propriety of including the amended OER in issue in plaintiff's records, it is that determination which, as a general proposition, is the subject of our review.[21] Our review of the ABCMR's decision leads us to conclude, therefore, that it acted in violation of its statutory mandate under 10 U.S.C. § 1552(a).[22]

Consequently, for the reasons stated *infra*, we find that the subject OER contained material legal errors and injustices; that the subject OER was therefore defective; that the defective OER had a prejudicial impact on plaintiff's records; that said OER was improperly included in plaintiff's records; that its inclusion in Muse's file resulted in a record that did not portray his military career in a fair and equitable manner as required under former 10 U.S.C. § 3442(c); and that these defects should have been, but were not, corrected by the ABCMR.[23] The support for our holding is, perhaps, best understood by a summary review of the applicable law governing these so-called "passover" cases.

## A. The Standards of Review

It is a well-settled principle of law that agency determinations of this sort are final unless they are arbitrary, capricious, unsupported by substantial evidence or contrary to law. *See, e.g., Sanders*, 219 Ct.Cl. at 298, 594 F.2d at 811; *Skinner v. United States*, 219 Ct.Cl. 322, 594 F.2d 824 (1979); *Boyd v. United States*, 207 Ct.Cl. 1 (1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); *Cooper v. United States*, 203 Ct.Cl. 300 (1973); *Dorl v. United States*, 200 Ct.Cl. 626, *cert. denied*, 414 U.S. 1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973); *Paskert v. United States*, 20 Cl.Ct. 65, 71 (1990); *Braddock v. United States*, 9 Cl.Ct. 463, 472 (1986). This rule has been consistently recognized in military pay cases. In fact, this standard of review was articulated most clearly in *Sanders*, 219 Ct.Cl. at 298, 594 F.2d at 811, where the Court of Claims stated that both this court and plaintiff are bound by a correction board decision unless it is:

... illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due.

(citations omitted).

Further, we have both the authority and the ability to review "passover" cases to ensure that the records (OERs in particular) of military officers are prepared

---

**20.** Because the ABCMR found no legal errors or injustices in need of correction, it did not *explicitly* address the question of whether Muse was considered for promotion on the basis of a "fair and equitable" record.

**21.** That function is clearly within the purview of our jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a). *See, e.g., Sanders*, 219 Ct.Cl. 285, 594 F.2d 804 (1979). *See also Sargisson v. United States*, 913 F.2d 918, 920, 921 (Fed.Cir.1990) (the Claims Court has jurisdiction over claims alleging that an illegal discharge resulted in the improper denial of the pay and allowances of office, as well as the jurisdiction to determine whether the military authorities have complied with their own regulations).

**22.** For the text of this section, *see* note 25, *infra.*

**23.** The thrust of our opinion here demonstrates that the ABCMR acted improperly when it determined that there was insufficient evidence to indicate probable material error or injustice. We need not consider its conclusion on the issue of timeliness before the ABCMR insofar as we have already found that aspect of the determination to be unsupported by any evidence in the record, and thus arbitrary, capricious, an abuse of discretion, and not in accord with law. *See Muse*, 13 Cl.Ct. at 381–383. Moreover, the defendant has clearly waived this issue here inasmuch as it was not pressed in this court and it is not jurisdictional.

in such a way that the affected officer is considered for promotion on a "fair and equitable" basis as required under either former 10 U.S.C. § 8442(c) or 10 U.S.C. § 3442(c). *See, e.g., Sargisson,* 913 F.2d at 922, *citing Engels,* 230 Ct.Cl. at 472, 678 F.2d at 177; *Hary,* 223 Ct.Cl. at 19, 618 F.2d at 709; *Sanders,* 219 Ct.Cl. at 302, 594 F.2d at 814.[24] *See also Gruendyke,* 226 Ct.Cl. at 195, 639 F.2d at 747; *Skinner,* 219 Ct.Cl. at 329, 594 F.2d at 828. To demonstrate that the records considered by a selection board do in fact contain material legal errors and injustices and, as a consequence, were not "fair and equitable," a claimant must present "cogent and clearly convincing evidence." *See, e.g., Cooper,* 203 Ct.Cl. at 304–305 (citations omitted). The level of required evidence is high because the petitioner "must overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *See, e.g., Sanders,* 219 Ct.Cl. at 302, 594 F.2d at 813 (citations omitted). This presumption "includes those officers who are charged with rating the performance of other officers." *Guy v. United States,* 221 Ct.Cl. 427, 433, 608 F.2d 867, 870 (1979). "[T]he burden is upon the plaintiff to prove otherwise." *Cooper,* 203 Ct.Cl. at 304 (citations omitted).

As previously indicated, CPT Muse has consistently alleged that the subject OER, and thus his record before every selection board that considered him for promotion, was in error and unjust. He contends that the ABCMR's failure to correct such deficiencies by invalidating the OER in issue was arbitrary, capricious, unsupported by substantial evidence, and contrary to law. Here he is again seeking to invalidate the

subject OER on the grounds of material legal error and injustice. However, the above-stated principles teach that the invalidation of an OER is an exceedingly onerous task. This is due not only to the presumption of regularity, but also to the inherently subjective nature of the evaluations themselves, a process that neither the correction boards nor this court will interfere with lightly. *Guy,* 221 Ct.Cl. at 433, 608 F.2d at 871 (citations omitted). For these reasons, the predecessor Court of Claims has stated that, when seeking to invalidate a challenged OER, a plaintiff such as Muse:

> ... must do more, to invoke court intervention, than merely allege or prove that an OER seems inaccurate, incomplete, or subjective in some sense. [Such a] showing is not enough where an allegation, even if proved, fails to establish the presence of "factors adversely affecting the ratings which had no business being in the rating process," [citation omitted], or where there is no clear violation of a specific objective requirement of statute or regulation, or where there is no misstatement of a significant hard fact.

*Hary,* 223 Ct.Cl. at 17, 618 F.2d at 708.

As this passage demonstrates, it is indeed difficult to invalidate an OER, a circumstance which is particularly true after a correction board has ruled on the question. However, it is clearly *not* impossible. If an OER contains material legal errors and injustices, then a correction board such as the ABCMR is obligated to correct those deficiencies pursuant to 10 U.S.C. § 1552(a).[25] *See, e.g., Sanders,* 219 Ct.Cl. at 302, 594 F.2d at 814. This is true, in part, because the correction board *must* ensure that a serviceman's record accurately portrays his career in the military. *See,*

---

**24.** The statutory criteria of former 10 U.S.C. § 3442(c) and 10 U.S.C. § 8442(c) presents a standard of review that enables us to judicially determine whether plaintiff's records were prepared in a fair and equitable manner. *See, e.g., Sargisson,* 913 F.2d at 922, and *Sanders,* 219 Ct.Cl. at 302, 594 F.2d at 814. However, we cannot review the military's exercise of discretion because such issues present nonjusticiable questions. *Voge v. United States,* 844 F.2d 776 (Fed.Cir.1988).

**25.** 10 U.S.C. § 1552(a) (1988) provides in pertinent part as follows:

> The Secretary of a military department, under procedures established by him and approved by the Secretary of Defense, and acting through boards of civilians of the executive part of that military department, may correct any military record of that department when he considers it necessary to correct an error or remove an injustice....

*e.g., Paskert,* 20 Cl.Ct. at 71, *citing* 10 U.S.C. § 1552(a), and *Murphy v. United States,* 16 Cl.Ct. 385, 392 (1989). Accurate records, and thus accurate OERs, are critical in the promotion selection process because "a substantially complete and fair record *is a necessary requirement [for] proper consideration [for promotion] by a selection board." Sanders,* 219 Ct.Cl. at 302, 594 F.2d at 814 (emphasis added). This type of consideration is guaranteed by 10 U.S.C. § 3442(c).

In this sense, the Court of Claims has stated that:

> [T]he selection procedure *must* follow the law. The documents which are sent to a Selection Board for its consideration therefore *must* be substantially complete, and must fairly portray the officer's record. *If a Service Secretary place[s] before the [Selection] Board an alleged officer's record filled with prejudicial information and omits documents equally pertinent which might have mitigated the adverse impact of the prejudicial information, then the record is not complete, and it is before the Selection Board in a way other than as the statute prescribes....*

*Id., quoting Weiss v. United States,* 187 Ct.Cl. 1, 7, 408 F.2d 416, 419 (1969) (other citations omitted) (emphasis added).

Thus, when a plaintiff seeks correction board relief to remedy an error or injustice before a promotion selection board, the correction board must act in compliance with the above-cited rules. The correction boards "have the authority *and duty* to correct records in order to correct an error or remove an injustice and to pay money found to be due when payment is necessary to correct a particular error or injustice." *Sanders,* 219 Ct.Cl. at 300, 594 F.2d at 812 (emphasis added); *Yee v. United States,* 206 Ct.Cl. 388, 397, 512 F.2d 1383, 1387 (1975). "[W]hen a correction board fails to correct an injustice [and/or an error] clearly presented in the record before it, it is acting in violation of its mandate." *Yee,* 206 Ct.Cl. at 397, 512 F.2d at 1387. *See also Sanders,* 219 Ct.Cl. at 301–303, 594 F.2d at 813–814; *Skaradowski v. United*

*States,* 200 Ct.Cl. 488, 489, 471 F.2d 627, 628 (1973); *Duhon v. United States,* 198 Ct.Cl. 564, 570, 461 F.2d 1278, 1281 (1972); *Paskert,* 20 Cl.Ct. at 71. What is absolutely critical here is that the correction board comply with the admonition in *Sanders* which emphatically provides that—"... where an applicant has convinced a correction board to correct his record it must not grant him 'half-a-loaf' of relief." 219 Ct.Cl. at 301, 594 F.2d at 813 (citation omitted). Moreover, the Court of Claims has repeatedly stated that "military correction boards 'have an abiding moral sanction to determine, insofar as possible, the true nature of an alleged [error or] injustice and to take steps to grant thorough and fitting relief.'" *Yee,* 206 Ct.Cl. at 398, 512 F.2d at 1387–1388, *quoting Duhon,* 198 Ct.Cl. at 570, 461 F.2d at 1281; and *Caddington v. United States,* 147 Ct.Cl. 629, 634, 178 F.Supp. 604, 606 (1959), *cited with approval in Sanders,* 219 Ct.Cl. at 301, 594 F.2d at 814. Thus, it is within the bounds of the above-stated principles that we must determine—whether the ABCMR acted arbitrarily, capriciously, without the support of substantial evidence, or contrary to law when it concluded that there were no errors or injustices in plaintiff's records, *i.e.,* the subject OER, to justify the deletion of that report.

**B. The Issues**

With these standards in mind, we turn to the precise issues presented in this case. As we have already observed, the broad issue is—whether CPT Muse has shown by clear and convincing evidence that, due to the presence of a defective OER, he was illegally discharged because he was considered for promotion, and ultimately passed over, on the basis of records that were not a fair and equitable portrayal of his military career. In this case, our review boils down to—an examination of whether the OER was in fact defective, and an analysis of its effect on plaintiff's records. This presents two clear issues— (i) whether the military authorities committed material legal errors and injustices when they prepared the OER, and if so, (ii) whether the ABCMR should have corrected

those errors and injustices to ensure that Muse was considered on a "fair and equitable" record.

*Discussion*

The most authoritative statement of what appears to be the current status of the law in cases such as the present one is contained in *Hary*. According to the Court of Claims, where an officer bases a claim upon the allegation that his or her records were unlawfully prepared and that this action resulted in passovers that in turn triggered an illegal separation from the service, which is the precise outline of plaintiff's assertions here, that officer must show (i) that the personnel record—the OER—reflects an error or injustice; (ii) that the error or injustice was material to promotion determinations; and (iii) that there was a nexus between that error or injustice and the resulting adverse action—the passovers and discharge.

In this context, the Court of Claims stated as follows:

> It is by now established in this court that ... a claimant seeking back pay on account of a separation or relief from active duty must show *both* that (a) there was a *material legal error* or an injustice [footnote citation omitted] in the proceedings of the correction board, or other entity within the military department, which led to the adverse action against him, *and also* (b) that there is *an adequate nexus* or link between the error or injustice and the adverse action (*e.g.*, passover and non-selection for promotion).

*Hary*, 223 Ct.Cl. at 15, 618 F.2d at 706–707 (emphasis added) (citations omitted). *See also Engels v. United States*, 230 Ct.Cl. at 467–468, 678 F.2d at 175; *Gruendyke*, 226 Ct.Cl. at 195, 639 F.2d at 747.

Pursuant to this authority, we find that the military officials here committed legal errors and injustices when they prepared the subject OER, and that the ABCMR was obligated to correct these errors to ensure that Muse was considered for promotion on the basis of a "fair and equitable" record as required by former 10 U.S.C. § 3442(c). More specifically, we hold that (i) the rater

and the indorser violated AR 623–105 when they prepared the OER; (ii) the defective OER had a material, and severely detrimental, impact on ensuing promotion considerations; and (iii) the defective OER had a substantial relationship with the resulting passovers and the ultimate involuntary discharge from active duty. The ABCMR was, therefore, on this record, obligated to delete the offending OER, to excise any record of passovers, and to right those wrongs by placing Muse before a selection board with a "clean" record, *i.e.*, to provide something more than a "half-a-loaf" of relief. *Sanders*, 219 Ct.Cl. at 301, 594 F.2d at 813 (citation omitted). Its failure to take any of these actions was arbitrary, capricious, unsupported by substantial evidence, and contrary to law. We now turn to a more detailed explanation for our conclusions. Pursuant to the standard set out in *Hary*, we will first address the presence of legal errors and injustices. Secondly, we will consider whether there was a "nexus" between those errors and injustices and the adverse action against Muse.

A. Error or Injustice in the Challenged OER

 Muse alleges four specific legal errors:

(i) the rater and the indorser violated AR 623–105 ¶ 4.3(f)(3), which purportedly required that the "superior" adjectival and numerical performance ratings in Part V should have been supported by specific comments in Part VII;

(ii) the rater and the indorser violated AR 623–105 ¶ 4.3(f)(4), which purportedly required the rater and the indorser to select adjectival and numerical ratings in Part V that were consistent with the narrative comments in Part VII;

(iii) that if the rater and the indorser had followed AR 623–105 ¶ 4.3(f)(3) and (4), they would have been forced to rate plaintiff's performance as "marginal" or "inadequate" in Part V based on their derogatory comments in Part VII. Their failure to properly rate plaintiff's performance in Part V resulted in an OER which was "adverse" in fact, but one which was not

properly characterized as "adverse" under AR 623–105 ¶ 5.2(h); and

(iv) that because the OER was not properly characterized as "adverse" under AR 623–105 ¶ 5.2(h), Muse was deprived of his due process right to respond under AR 623–105 ¶ 5.2(i).

It is well settled that regulations governing the preparation of evaluation reports:

... prescribe that OERs are to be objective and prepared in a certain way. If a particular officer's OER has not been so prepared and that defect could have resulted in his nonselection for promotion, followed by discharge, this is legal and factual error and an injustice to the officer as well. If he is not made whole by correction of his record, we can and will protect the citizen-soldier's legal rights if he is claiming lost pay and reinstatement.

*Sanders,* 219 Ct.Cl. at 303, 594 F.2d at 814.

Moreover, "[i]f OERs are not prepared in the manner *required by law,* they are *not* properly included in an officer's records before selection boards." *Guy,* 221 Ct.Cl. at 432, 608 F.2d at 870 (citation omitted) (emphasis added). However, in reviewing the manner in which the OER in issue was prepared, we must temper our examination of the record with the recognition that, while the general intent of AR 623–105 is to ensure by every reasonable means possible that OERs are to be completed in an objective manner, "perfect objectivity in the rating process cannot be expected or even hoped for." *Id.,* 221 Ct.Cl. at 433, 608 F.2d at 870–871. Under these principles, we hold that Muse has unequivocally proven the existence of prejudicial legal errors, also constituting injustices, that should have been corrected by the ABCMR. Consequently, we find merit in each asserted error raised by plaintiff, which, while they are interrelated, we shall address seriatim.

(1)` *The Rater and the Indorser Failed To Follow The Mandatory Guidance of AR 623–105 ¶ 4.3(f) in Completing Part V "Demonstrated Performance Of Present Duty."*

Muse strenuously contends that the rater and the indorser violated AR 623–105

¶ 4.3(f)(3) and ¶ 4.3(f)(4), when they failed to provide narrative comments in Part VII of the OER that supported, and were consistent with, the "superior" numerical and adjectival ratings in Part V. We agree. AR 623–105 ¶ 4.3(f) governs the preparation of Part V of the OER, which is designed to reflect the rater's and the indorser's *reasoned* scoring of the rated officer's *present duty* performance. Both rating officials are *obligated* to evaluate performance in *one* of six *adjectival* categories that cover ratings of—"outstanding," "superior," "excellent," "effective," "marginal," or "inadequate." This is so because instructions, found both in the regulations and on OER Form 67–7 itself, counsel the rating officials to place a numerical score in a box corresponding to each of these possible ratings.

In this context, AR 623–105 ¶ 4.3(f), titled "Demonstrated Performance of Present Duty," provides:

(1) ... When assigning adjectival and numerical ratings related to performance of duty, the rater must consider the relative quality and effectiveness of the rated officer's performance; individual talents and qualifications of the rated officer; and how well the rated officer fulfilled the responsibilities and demands associated with the position concerned....

(2) It must be recognized that the majority of U.S. Army officers may be classified as EFFECTIVE or EXCELLENT performers.

(3) *Extreme ratings* (\* blocks) [*i.e.,* "outstanding" or "superior" ratings] *must be fully supported by specific comments in Part VIIa; generalities and stereotyped comments are not acceptable....*

(4) *Raters [and indorsers] will select that adjective, among those defined hereafter, which best describes the manner of performance demonstrated by the rated officer during the rating period concerned.* Thereafter, the rater [and the indorser] will assign a numerical score, consistent with the adjectival rating, further distinguishing the rated offi-

cer's performance within the appropriate adjectival range.

(a) Outstanding (70–68) denotes the highest quality performance of duty and professional competence. It represents effectiveness and capacity rarely seen in the rated officer's grade and experience level. Factual performance information, unequivocally justifying this rating and clearly distinguishing the rated officer among contemporaries, must be provided in Part VIIa, DA Form 67–7. . . .

(b) *Superior (67–57) denotes very high quality performance, as well as competence and effectiveness attained by very few officers. This rating must also be justified by comments, clearly illustrative of the rated officer's superiority to contemporaries, in Part VIIa,* DA Form 67–7. Justification, if provided in Part IVb, need not be repeated.

(c) Excellent (56–36) denotes above average performance and effectiveness.

(d) Effective (35–15) denotes normal performance expected of an officer of the grade and experience of the rated officer.

(e) *Marginal (14–4) denotes low quality performance and competence. It indicates the rated officer's motivational deficiencies or weaknesses.* Rating[s] of this nature must be explained and clarified by comments in Part VIIa, DA Form 67–7. . . .

(f) *Inadequate (3–0) denotes totally unacceptable performance below minimum standards.* Ratings of this nature must be fully supported by comments provided in Part VIIa, DA Form 67–7. . . .

(emphasis added).

Here, both the rater and the indorser described plaintiff's *present duty* performance, as Assistant Trial Counsel, as "superior." LTC Turner, the rater, assigned a numerical score of 60 while Col. Lassiter, the indorser, scored Muse with a 66. Both numerical scores carried an adjectival description of "superior." In fact, the indorser's score of 66 was only two points below the level of an "outstanding" adjectival rating. Given such exceptionally high numeri-

cal and adjectival ratings by *both* the rater and the indorser in Part V, one would, of course, expect that the rating officials would supply the supporting comments that "[were] clearly illustrative of the rated officer's superiority" in Part VII, as *required* by both the regulations and DA Form 67–7. Surprisingly, however, an examination of Part VII of the subject OER reveals that neither the rater nor the indorser supplied the specific supporting comments *explicitly required* by AR 623–105 ¶ 4.3(f)(3), ¶ 4.3(f)(4)(b), and DA Form 67–7 itself. Thus, it is an indisputable fact that in this very critical circumstance, the rating officials failed to follow their own obligatory regulations. This is clear legal error because "[i]t has long been established that government officials *must* follow their own regulations, even if they were not compelled to have them at all." *E.g., Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir. 1988), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (citation omitted) (emphasis added). The regulatory requirement to supply supporting comments for a "superior" *performance* rating has a discernible and rational purpose which could not have been any more obvious to the rating officials, nor could it have been any more apparent to the ABCMR that the rater and the indorser thoroughly failed to provide such supporting comments, as required by their own regulations.

A review of the narrative comments in Part VII underscores the point. In Part VII(a), the rater stated:

CPT Muse is an extremely ambitious and personable officer who is well liked. He is a good organizer who enjoys and excels in performing legal assistance duties. However, his performance as trial counsel was erratic. He was frequently criticized for ineffective courtroom performance. He is not a good public speaker and was not always thoroughly prepared in court. . . . He was overly involved in off-duty business activities (real property development and investment) which adversely affected his duty performance.

Similarly, in Part VII(b) the indorser made only negative observations relating to plaintiff's *performance as an Assistant Trial Counsel.* He stated that:

> This officer is forceful, aggressive, and takes charge of the situation. Intellectually he is far superior to his peer group in both law and military science. He is not articulate in responding to counsel in a forensic environment. He is not comfortable when required to think quickly on his feet. His trial preparation requires further development. He plans ahead. He organizes his effort. He works well with counsel and commanders. He is productive. He is physically fit and morally straight. He is an administrator and is best utilized in that role.

Clearly, these narrative comments do not depict, as required, "specific examples or illustrations ... to support" a "superior" *performance* rating as given in Part V. In fact, as we see it, all of the comments by both the rater and the indorser relating to plaintiff's *present performance of duty as Assistant Trial Counsel* are highly critical, patently derogatory, and clearly incongruent to the assigned "superior" rating. The positive comments found in Part VII give defendant no comfort because they do not relate to those *present* duties with respect to which CPT Muse was being rated. Rather, those comments are simply bland and basically universal attributes, again diverging from the AR 623–105 ¶ 4.3(f)(3) prohibition against "generalities and stereotyped" statements. Consequently, we reject the defendant's nebulous and meaningless assertion that the OER was a "mixed" *performance* evaluation.

As we see it, the record clearly shows that the obligatory Part VII comments referencing plaintiff's present performance do not paint the picture of a "superior" Assistant Trial Counsel. The negative narrative *performance* rating was further underscored by extremely critical statements by the rater in Part IV(b) of the OER. There, in the context of the professional attributes demonstrated by Muse, the rater, LTC Turner, stated that:

> 2, 7: Officer's knowledge of military criminal law and procedure is deficient; his ability to gather relevant facts and research the law is substandard.
>
> 11, 12: Officer occasionally neglected his military duties to concentrate on off-duty business activities. Officer was counseled on the noted attributes.

An officer who (i) has deficient knowledge of criminal law and procedure, (ii) has no substantial research and fact gathering abilities, (iii) neglects his duties in favor of personal interests, (iv) is frequently criticized for his ineffective courtroom performance, (v) is erratic, (vi) is a poor public speaker, (vii) is not always thoroughly prepared in court, (viii) is inarticulate in a forensic environment, and (ix) is uncomfortable when required to think on his feet, unquestionably does not demonstrate "superior" *performance* in his present Assistant Trial Counsel duties as contended by the raters. Such performance characteristics clearly fail to denote "very high quality performance, as well as competence and effectiveness attained by very few officers," as defined by the regulation for an adjectival rating of "superior." AR 623–105 ¶ 4.3(f)(4)(b). Moreover, these *performance* narrative comments are also *not* "clearly illustrative of the rated officer's superiority to contemporaries." *Id.*

From the foregoing, the record facts are crystal clear that both the rater and the indorser failed to comply with the *mandatory* regulatory requirements of AR 623–105 ¶ 4.3(f)(3) or ¶ 4.3(f)(4). As demonstrated by reference to the comments in Part VII, *supra*, plaintiff's "superior" *performance* rating in Part V was neither supported nor justified in the former part.[26] In short, the comments of the rating officials in Parts IV(b) and VII simply do not describe the type of "superior" officer that is contemplated by ¶ 4.3(f)(4)(b). At best, the grossly derogatory statements in Parts IV(b) and VII describe a "marginal" officer

---

**26.** AR 623–105 ¶ 4.3(f)(4)(b) also provides that "[j]ustification [in Part VII], if provided in Part IV, need not be repeated." The record is clear that Part IV(b) also failed to contain any justification for the "superior" adjectival rating in Part V of subject OER.

as defined in AR 623–105 ¶ 4.3(f)(4)(e), *i.e.*, one who has demonstrated "low quality performance and competence." They certainly do not describe an officer who is "effective." In other words, these narrative comments do not denote "normal performance expected of an officer of the grade and experience of the rated officer." AR 623–105 ¶ 4.3(f)(4)(d). In fact, the disparaging and damaging statements in the subject OER are so inflammatory and so degrading that plaintiff's adjectival *performance* rating could easily have been described as "inadequate" in AR 623–105 ¶ 4.3(f)(4)(f), *i.e.*, "totally unacceptable performance below minimum standards." It is clear to this court that the OER coi - ments in Part VII would support such a rating were it not for a few glowing *general* statements from the indorser.

Our conclusion that the rating officials described a "marginal" or "inadequate" officer by their extremely derogatory comments in Part IV(b) and Part VII is further supported by the plain meaning of those two terms. *Webster's New Collegiate Dictionary* 703 (5th ed. 1977) defines "marginal" as "close to the lower limit of qualification, acceptability, or function," while "inadequate," as might be expected, is merely defined as "not adequate" or "insufficient." *Id.* at 578. Thus, according to the definition of "adequate," an inadequate performance would not even rise to the level of being "barely sufficient or satisfactory." *Id.* at 14. These definitions are consistent with, but at the same time clarify, the regulations. Obviously, the facts present in this record, as clearly stated by the rating officials in Part IV(b) and Part VII, *see supra*, describe Muse as an Assistant Trial Counsel whose performance was "close to the lower limit of qualification, acceptability, or function." In fact, the severe inflammatory comments in Parts IV(b) and VII clearly demonstrate that the rater and the indorser viewed plaintiff's performance as being "insufficient." In this context, the "superior" adjectival and numerical scores awarded in Part V were plainly inconsistent with the scores otherwise warranted by the comments of the rating officials.

■ Given the foregoing, we find on this record that *both* the rater and the indorser violated AR 623–105 ¶ 4.3(f) in its entirety when they assigned "superior" numerical and adjectival scores in Part V that were coupled with extremely gross, derogatory, and patently inconsistent comments in Part IV(b) and Part VII. Further, we find that the failure of both the rater and the indorser to cite specific examples or illustrations in Part VII to support the ratings in Part V was also unadulterated legal error and an injustice as well. In fact, even the most cursory examination inexorably leads to the conclusion that, had the rating officials followed the mandatory guidance of AR 623–105 ¶ 4.3(f), plaintiff's performance of duty would have been rated as "marginal" at best, or "inadequate" at worst.[27] This is unquestionably so because the numerical and adjectival ratings in Part V *must be justified* by the narrative comments in Parts VII or IV(b). This requirement has clearly not been satisfied, as it would indeed strain credulity to hold that those grossly disparaging comments could support a "superior" rating. The failure of the rating officials to follow their own regulations was legal error in this respect, and such error resulted in a report which should have been characterized as technically "adverse" under the regulations. This, in turn, caused yet another more serious legal error amounting to a deprivation of procedural due process, a problem we examine next.

However, before doing so, we will address the defendant's assertion that this court is bound by the ABCMR decision denying relief. The decision stated that there was no basis upon which to conclude that Muse should have been rated as either "marginal" or "inadequate" in Part V of

---

**27.** Quite obviously, by invalidating the adjectival "superior" rating in Part V, the corresponding numerical "superior" scores in Part V must also be invalidated. By virtue of this fact, the overall numerical scores in Part VIII are equally invalid. This being the case, the OER in issue must be entirely deleted from plaintiff's records.

the OER. In this connection, the ABCMR stated that:

A complete review of the OER indicates that based on the comments of the rating officials, *the numerical ratings could have been somewhat lower* [than the 60 and 66 "superior" numerical scores assigned by the rating officials], *but not necessarily [numerically] low enough to [be "marginal" or "inadequate" and thus] cause the report to be adverse as the applicant contends. Based on this review and the comments rendered by the rating officials, it would appear that the applicant should have been rated as either "effective" or "excellent" in Part V.* However, the failure to do so by the rating officials has not deprived the applicant of his right to due process.

(emphasis added).

Upon close inspection of this critical paragraph, we hold that the ABCMR erred in its interpretation of AR 623–105 ¶ 4.3(f)(4), the regulatory provision at issue here. This is true because the ABCMR clearly premised its analysis of the efficacy of subject OER primarily, if not solely, on the basis of the *numerical* ratings given to Muse in Part V. It did not *first* consider, nor is there any indication in the record that it examined, the impact and importance of the *adjectival* ratings in Part V, as it was unequivocally obligated to do under the plain language of AR 623–105 ¶ 4.3(f)(4). That section provides that the adjectival ratings in Part V, which are by necessity based on the narrative comments in Parts IV(b) and VII, describing the manner of performance by the officer, must be assigned *before* the officer is rated numerically. By reversing this process in its analysis, and by ignoring the importance of the adjectival ratings in Part V and their relationship with the narrative comments in Parts IV(b) and VII, the ABCMR committed legal error. Thus, its decision denying relief was plainly arbitrary, capricious, unsupported by substantial evidence, and contrary to law.

We begin our analysis by observing that AR 623–105 ¶ 4.3(f)(4) *explicitly* states that the rating officials:

... *will select that adjective,* among those defined hereafter, [i.e., outstanding, superior, excellent, effective, marginal, or inadequate] *which best describes the manner of performance demonstrated by the rated officer during the rating period concerned. Thereafter, the rater [and the indorser] will assign a numerical score, consistent with the adjectival rating, further distinguishing the rated officer's performance within the adjectival range.*

(emphasis added).

Clearly, the ABCMR considered *only* the numerical half of the Part V ratings equation. Moreover, it failed to address the probative evidence it relied upon to justify the conclusion that "the applicant should have been rated as either effective or excellent in Part V." In this connection, therefore, it conceded that plaintiff's numerical scores could have been lower than the 60 and 66 assigned by the rating officials. It nevertheless concluded, without explanation, that those numerical scores could not have been low enough to place Muse in the adjectival range of "marginal" (4–14) or "inadequate" (0–3) which would have required the OER in issue to have been classified as "adverse" under AR 623–105 ¶ 5.2(h). Stated differently, even though the ABCMR recognized that Muse could have been rated lower numerically, it determined that the numbers could not have been any lower than "excellent" (56–36) or "effective" (35–15). In arriving at this naked conclusion, the ABCMR failed to embrace one scintilla of evidence in the record to substantiate that position. The reason for such failure is readily apparent upon a thorough review of the administrative record, because there is no such creditable evidence.

This is clear legal error, given the foregoing, because it is contrary to the rating process set out in AR 623–105 ¶ 4.3(f)(4). That paragraph unequivocally instructs the rating officials, and thus the ABCMR in its review, to assign *adjectival* ratings that

best describe the rated officer's perform-ance *first*. Obviously, those adjectival rat-ings *must* be based on, and drawn from, the narrative comments in Part VII and Part IV(b), "which best describe the man-ner of performance demonstrated by the rated officer." Addiitonally, the adjectival ratings ultimately assigned must also be weighed against the regulatory definitions contained in AR 623–105 ¶ 4.3(f)(4)(a)–(f). It is only *after* the rating officials, and thus the ABCMR, have assigned their *ad-jectival* ratings, which are dictated by the *narrative comments* in Parts VII and IV(b), that the numerical scores can be sensibly and rationally determined within the appropriate range. Said scores, accord-ing to AR 623–105 ¶ 4.3(f)(4), are designed for the sole purpose of further distinguish-ing the rated officers grouped in the same adjectival category. Thus, the numerical ratings do not serve as the basis for deter-mining the adjectival ratings themselves, as the ABCMR decision seems to suggest. Rather, the converse is true pursuant to the three-step analysis required by AR 623–105 ¶ 4.3(f)(4).

Therefore, we find that the ABCMR failed to follow this explicit regulatory guidance scheme in its sparse analysis. It erroneously looked to the numerical ratings as the sole basis for finding that Muse could not have been rated any lower than "effective." In its review, it completely failed to address the record evidence re-garding the obvious and inextricable rela-tionship between the narrative comments in Parts VII and IV(b), and the manner of determining the adjectival and numerical ratings in Part V. In short, the ABCMR failed to reconcile the *extremely* derogato-ry comments in Parts IV(b) and VII of the OER with the appropriate adjectival de-scriptions in Part V. Moreover, there is absolutely nothing in the ABCMR decision to suggest that it compared the narrative performance commentary on the face of the OER with the adjectival definitions in AR 623–105 ¶ 4.3(f)(4)(a)–(f). All that ap-pears with respect to this issue from the ABCMR's decision are naked and conclu-sive generalities, totally devoid of substan-tive evidentiary support, that plaintiff's nu-

merical scores could not have been low enough to warrant an "adverse" report.

Instead of focusing in its analysis solely on the issue of numbers, the ABCMR should have inquired—whether, *based on the entire record*, the narrative comments bearing on plaintiff's *demonstrated per-formance* in Part IV(b) and Part VII were sufficiently prejudicial to warrant "margin-al" or "inadequate" adjectival ratings in Part V, pursuant to the definitions as-signed to those terms in AR 623–105 ¶ 4.3(f)(4)(e) and (f). At this point it would have been appropriate for the ABCMR to examine the assigned numerical ratings, and then only to determine whether they were consistent with the *previously as-signed* adjectival ratings in Part V, and the narrative comments in Parts IV(b) and VII. If the ABCMR had followed this procedure, we have no doubt whatsoever that, on this record, it would have determined (i) that the narrative comments in Parts IV(b) and VII were grossly derogatory, (ii) that said narrative comments warranted "marginal" and/or "inadequate" adjectival perform-ance ratings, according to the definitions of those terms in AR 623–105 ¶ 4.3(f)(4)(a)–(f), and (iii) most critical to the issues herein, that such adjectival performance ratings necessarily *required*, under AR 623–105 ¶ 4.3(f)(4), the assignment of consistent nu-merical scores of *14 or lower* from both rating officials. Because of the foregoing we hold that the ABCMR's failure to grant affirmative relief was arbitrary, capricious, unsupported by substantial evidence, and contrary to law.

Notwithstanding the above, the defen-dant argues that the ABCMR's conclusion is justified because many portions of AR 623–105 are intended only as "instructional guides for use by rating officials in the preparation" of OERs; that the "AR does not prescribe a strict correlation between narrative comments and scores"; that "matching narrative statements to scores is a judgment call" for the rater and the indorser; and finally, that the agency's in-terpretation of AR 623–105 is entitled to deference. We do not agree with the con-clusory and hospitable assertions of defen-

dant. While precedent holds that—"[i]n construing administrative regulations, the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation," *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (citations omitted), this language gives defendant at bar no comfort. This is indisputable because we have amply and persuasively demonstrated that the interpretation preferred by both the rating officials and the ABCMR was indeed plainly erroneous and inconsistent with the clear requirements of AR 623–105. It is well established that the rating officials and the ABCMR were required to follow their own regulations, *Voge,* 844 F.2d at 779, and here the record is clear that they did not.

In addition to the foregoing, we find the ABCMR decision to be egregiously conclusive. That is to say, its decision appears to consist of only minimal discussion on the primary rating issues raised by CPT Muse. In fact, "[t]he opinion is more a catalogue of the contentions considered by the Board than an explanation of how the material and arguments presented were weighed and appraised. In these circumstances, we [are entitled to] give less deference to the Board's conclusions than we would do if a reasoned explication had been forthcoming." *Hary,* 223 Ct.Cl. at 18, 618 F.2d at 708, n. 6. Moreover, we find that " 'there [was] no satisfactory showing on the record that the [decision] was based upon a *balanced* consideration of all the evidence available and presented.' " *Werner v. United States,* 226 Ct.Cl. 462, 469, 642 F.2d 404, 408 (1981) (citation omitted) (emphasis added). In fact, we are thoroughly convinced that the record is devoid of any creditable evidence demonstrating that the ABCMR actually weighed all of the operative facts before it against the regulatory criteria contained in AR 623–105 ¶ 4.3(f).

Consequently, we are constrained to find, as did Judge Durfee in *Beckham v. United States, infra,* that this:

 ... naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evi-

dence in writing (as here), is inimical to a rational system of administrative determination and ultimately inadequate [citations omitted]. "In these circumstances [summary and sketchy findings and reasoning by the administrative Board] we cannot give as much deference to the Board's determination as if it had given detailed findings to support, and fuller explanations of the reasons for, its conclusion. We are compelled to look to the record without much help from the Board's opinion, and therefore, without the need to accord as great weight to its determination as we otherwise would. [citation omitted]."

183 Ct.Cl. 628, 636, 392 F.2d 619, 622–623 (1968).

Therefore, by engaging in a thorough, probing, and in-depth examination of the record on our own, *see Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1976), we find that CPT Muse has *clearly and convincingly proven* that, if the rating officials had followed AR 623–105 ¶ 4.3(f), he would have been rated as "marginal" at best or "inadequate" at worst regarding the performance of his assigned duties as an Assistant Trial Counsel. The ABCMR determination that he should have been rated as either "excellent" or "effective" clearly has no rational factual basis on this record, particularly in view of the grossly explicit and derogatory comments in Parts IV(b) and VII of the OER in issue. Thus, we hold that the ABCMR's decision on this issue was plainly arbitrary, capricious, unsupported by substantial evidence, and clearly contrary to law. We now address the next alleged error in the subject OER—the question of whether the OER was in fact "adverse" under the regulations.

(2) *The OER Was Adverse Under AR 623–105 ¶ 5.2(h).*

CPT Muse alleges that, had his numerical and adjectival ratings in Part V been consistent with the narrative in Parts IV(b) and VII, he would have been rated as either "marginal" or "inadequate" instead of

"superior" in Part V. Under those circumstances, the contested OER would have been characterized as "adverse" under AR 623–105 ¶ 5.2(h). The benefit of such a report is that he would have been entitled to respond and explain all relevant *mitigating* circumstances under AR 623–105 ¶ 5.2(i). If he had been permitted to exercise this procedural right of due process, he asserts that he may have been able to persuade the rating officials to amend the OER, or failing that, to include his own explanation of extenuating/mitigating circumstances that would have ameliorated the negative effect of the OER. Given the record facts here, the provisions of AR 623–105 ¶ 4.3(f), and the derogatory performance comments in Part IV and Part VII, we again agree with Muse. Clearly, the record compels a finding that he should have been rated as "marginal" or "inadequate" in Part V pursuant to the clear definition of those terms in AR 623–105 ¶ 4.3(f)(4)(e) and (f), respectively.

The defendant's failure to do so, *see supra*, was clear legal error, an error that was compounded by its resulting failure to properly characterize the OER as "adverse" as required under AR 623–105 ¶ 5.2(h). That section provides that:

... An adverse report is one containing any of the following:

\* \* \* \* \* \*

(2) *A report resulting in an adjectival rating of "marginal" or "inadequate" in Part V.*
(3) A report resulting in an appraisal to "promote this officer ... behind his/her contemporaries" or "not promote this officer" in Part VI.

(emphasis added).

Notwithstanding the *gross disparaging narrative* given Muse in Parts IV(b) and VII, he was not rated as "marginal" or "inadequate" in Part V. Rather, both the rater and the indorser gave Muse "superior" numerical and adjectival ratings in Part V. Moreover, neither recommended that Muse be promoted either behind his contemporaries or not at all in Part VI. Thus, Muse did not receive an "adverse" report in the technical sense. For this sole reason,

the reply mechanisms governing an "adverse" report were not triggered. In other words, Muse failed to receive the benefits of AR 623–105 ¶ 5.2(i), which provides in pertinent part as follows:

*Adverse reports will be referred in writing to the rated officer* by the indorser for acknowledgement and/or comment after the indorser has completed his/her portion of the report.... *The rated officer* will acknowledge receipt of the adverse report and *may enclose a comment/statement when he/she believes that the rating or remarks are incorrect....*

(emphasis added).

Based on our foregoing decision that the narrative comments in Parts IV(b) and VII of the OER clearly describe a "marginal" or "inadequate" performance of present duties, a circumstance which the rating officers erroneously described as "superior" in violation of AR 623–105 ¶ 4.3(f), we find —that, in actuality, the OER should have been given the technical status of an "adverse" report under AR 623–105 ¶ 5.2(h). For this reason, Muse was plainly entitled to exercise his right to reply to that "adverse" report under AR 623–105 ¶ 5.2(i). These failures by the defendant in violation of said regulations constituted legal error and injustice by the rating officials.

Moreover, it would be patently unreasonable and a gross injustice to conclude that the subject OER was anything other than "adverse" in fact. Again, this is unequivocally demonstrated by reference to the ordinary meaning of that word. In that sense, an "adverse" report is one that is "opposed to one's interests" or *"unfavorable."* *Webster's New Collegiate Dictionary* 17 (5th ed. 1977) (emphasis added). Here, it is plainly evident that the OER in issue was, in all material respects, *unfavorable* to plaintiff's interests. The rating officials unabashedly denigrated every aspect of his performance *as an Assistant Trial Counsel.* Thus, even if we were to agree with the defendant's assertions that the OER was not technically an adverse report, which we do not, the plain meaning of that term necessarily leads us to con-

clude that the report was nevertheless adverse in fact. This circumstance should have been equally apparent to the ABCMR. The ABCMR, therefore, acted arbitrarily, capriciously, without the support of substantial evidence, and contrary to law when it failed to recognize and correct these legal errors, *i.e.*, to technically characterize the report as "adverse."

The defendant, relying on the recent decision in *Sargisson v. United States*, 913 F.2d 918 (Fed.Cir.1990), *pet. for reh'g filed* (September 13, 1990), and *Voge v. United States*, 844 F.2d 776 (Fed.Cir.1988), contends that the ABCMR determination that Muse should have been rated either "excellent" or "effective," and thus, that the OER was not technically "adverse" under AR 623–105 ¶ 5.2(h), is a highly discretionary decision that is nonjusticiable in the Claims Court. We find this position to be incredulous. The Court of Claims has consistently held, and *Sargisson* reaffirms, that this court is authorized to review the defendant's actions in "passover" cases to ensure that the records of the service member before a selection board portray his/her military career in a "fair and equitable" manner, as required by statute. *See, e.g., Sargisson*, at 922, *citing Engels*, 230 Ct.Cl. at 472, 678 F.2d at 177; *Hary*, 223 Ct.Cl. at 19, 618 F.2d at 709; *Sanders*, 219 Ct.Cl. at 302, 594 F.2d at 814.[28] In such "passover" cases, the courts have traditionally looked to see whether the correction board properly discharged its statutory mandate to ensure that these records were indeed substantially accurate. If the correction board failed to correct those errors and injustices in the personnel records, such as defective OERs, then it was acting arbitrarily, capriciously, without substantial evidence, and contrary to law. That is the precise inquiry we have in issue at bar. As such, we hold that *Sargisson* does not preclude us from passing on the subject cross-motions.

In sum, we find that the rater and the indorser committed multiple legal errors and injustices in their preparation of the subject OER. Consequently, the ABCMR was obligated to correct those errors and injustices by deleting the OER from plaintiff's personnel file. By failing to do so, it too committed a legal error and injustice. We now turn to the second prong of our analysis—whether there is a nexus between the defective OER and the adverse action against Muse.

**B. The Impact of the Defective OER**

■ Having concluded that the OER in issue was defective and should have been removed from CPT Muse's records, the next question is—whether plaintiff's nonselections were or may have been substantially influenced by the defective OER so as to warrant an order to also void those passovers. In other words, "[f]or those cases, like this one, in which the challenge rests on defective OERs or an incomplete or inadequate military record, the next question for us is whether the error is causally linked with the passover—in summary terms, was it prejudicial or harmless?" *Engels*, 230 Ct.Cl. at 468, 678 F.2d at 175. To prevail on this showing of "nexus," Muse "must make at least a prima facie showing of a substantial connection between the error and the passover. But the end-burden of persuasion [on the other hand] falls to the government to show harmlessness—that, despite plaintiff's prima facie case, there was no substantial nexus or connection." *Id.* The defendant, "with its far greater knowledge of the facts, statistics, and operations of the promotion selections process, is in [a] much better position to produce evidence and materials showing the lack of adequate nexus in spite of the claimant's prima facie case." *Id.*, 230 Ct.Cl. at 468–469, 678 F.2d at 175. As the Court of Claims stated in *Sanders*, 219 Ct.Cl. at 306, 594 F.2d at 816, "the ultimate burden [is] on the party whose

---

**28.** *Sargisson* states that the Court of Claims reviewed the actions of selection boards under the now repealed 10 U.S.C. § 8442(c), which required a "fair and equitable" record. Muse alleges that his record was not "fair and equitable" as required by former 10 U.S.C. § 3442(c). That section provides the same standard of review, and is a basis for us to review those matters raised here. *See Sanders*, 219 Ct.Cl. at 302, 594 F.2d at 814.

error and obfuscation of the evidence caused the problem in the first place."

In addressing the issue of nexus, we are guided by two separate but interrelated standards: "First, was the claimant's record prejudiced by the errors in the sense that the record appears worse than it would in the absence of the errors? Second, even if there was some prejudice, is it unlikely that he would have been promoted in any event?" *Engels,* 230 Ct.Cl. at 470, 678 F.2d at 176, *citing Hary,* 223 Ct.Cl. at 21, 618 F.2d at 710. "Where the Correction Board applies these standards and principles, its determination of the issue of nexus will stand if it is supported by substantial evidence and non-arbitrary." *Engels,* 230 Ct.Cl. at 471, 678 F.2d at 177 (citations omitted). In the subject case, however, the ABCMR did not even reach this question because it found no legal errors or injustices in need of correction. Accordingly, as in *Engels,* 230 Ct.Cl. at 471, 678 F.2d at 177, and *Hary,* 223 Ct.Cl. at 20, 618 F.2d at 709–710, we must, therefore, search the record for ourselves to determine the presence or absence of the requisite connection or nexus.

· In this context, because the *defective* OER was included in plaintiff's records before every selection board, we find that Muse was not portrayed in a "fair and equitable" manner, as required by former 10 U.S.C. § 3442(c). Indeed, the prejudical nature of the OER in issue is underscored by the apparent absence of any other negative comment in his personnel record. In addition, at the time CPT Muse first became eligible for a temporary promotion in the spring of 1980, the "adverse" OER was one of only four OERs in his file that were prepared *subsequent* to plaintiff's graduation from law school. Thus, 25% of plaintiff's record *as a JAG officer* was a legally erroneous evaluation of his performance of duty.

Moreover, the subject OER, as amended, created a record that was substantially worse, in our opinion, than would have been the case had those records contained plaintiff's mitigating response to a properly characterized "adverse" report. This is so because, had the report been characterized as "adverse," it appears likely that Muse would have submitted a creditable explanatory response with a substantially mitigating effect in relation to the derogatory comments by the rater and the indorser. The record clearly shows that a number of crucial ameliorating facts were omitted from the OER, and the rater and the indorser totally ignored them to Muse's detriment.

For example, the following statements by the *rater* (LTC Turner) himself made on January 18, 1982, almost three years *after* the subject OER (April 1978 to April 1979), are *extremely* probative:

I would like to put some facts into perspective. During the rated period ... Muse was one of only two trial counsel assigned to the Military Justice Section.... Both trial counsel were relatively inexperienced and neither enjoyed the customary procedure of having an experienced more senior JAGC officer supervisor serving in the role of Chief of the Military Justice Section. In fact, the former Chief of the Military Justice Section was reassigned to be Chief of the Trial Defense Service Office at Fort Sill shortly after Captain Muse was assigned trial counsel duties. Another more experienced trial counsel was also reassigned from the Military Justice Section to the Trial Defense Service Office at Fort Sill. The consequences of these reassignments of the more experienced trial counsel to the Trial Defense Service and the assignment of two inexperienced trial counsel to the Military Justice Section resulted in a tremendous imbalance of talent and experience. The effect was that the two trial counsel prosecutors, in complicated cases, were frequently overmatched.

In retrospect, I believe ... Muse would probably have performed better as a trial counsel if he would have had an experienced trial counsel (Chief of Military Justice Section) to consult with and to obtain necessary guidance, advice and supervision when trying cases. Consequently,

my comments on the subject OER need to be read in context with that fact.

\* \* \* \* \* \*

*In conclusion, I recommend that ... Muse be favorably considered for promotion to Major.... The Army, in my opinion, must carefully view his entire record when considering him for promotion, not just this single subject OER which occurred during a difficult assignment for Captain Muse....*

(emphasis added).

This candid admission unequivocally establishes that the OER portrayed Muse in less than a "fair and equitable" manner. It is crystal clear that Muse was unable to adduce and include these mitigating facts in his personnel file for consideration by the promotion selection boards precisely because of the legal errors and the unjust actions committed by the rating officials when they violated AR 623–105. Therefore, we find that the presence of the defective OER for the rated period April 18, 1978 to April 17, 1979, was grossly prejudicial.

By the same token, we find that Muse has made a clear and convincing showing that the prejudicial impact of the defective OER contributed substantially to, and perhaps it was the sole reason for, his passovers. We find this to be true because his record is in every other respect outstanding in that the ratings and comments in all other OERs are exceptionally laudatory. At the time Muse was first considered for his temporary promotion to Major, his personnel file showed that he was a 1970 West Point graduate; that he had a most distinguished combat record in Vietnam; that he had been decorated with the Combat Infantry Badge and Bronze Star Medal; that he had received his masters degree in business administration from the University of Hawaii in 1974; that he was a certified public accountant; that he had been selected to attend law school at the Army's expense under the Funded Legal Education Program (FLEP); and that he graduated from Brigham Young University Law School and was admitted to the practice of law in the State of Utah.

Further, a profile of plaintiff's OERs from the beginning of his military career shows consistent ratings of the highest, or very nearly the highest, caliber. The defective OER in issue is clearly the only record in plaintiff's file that we can find which would or could explain the passover. The defendant has made no attempt in its motion to rebut this clear and convincing showing by Muse. Consequently, we hold that Muse has clearly and persuasively established a sufficient nexus between the legal errors in the defective OER and the subsequent passovers. Therefore, we further find that plaintiff's discharge from active duty was unlawful.

*Conclusion*

The rater and the indorser committed clear and obvious material legal errors and injustices when they prepared the disputed OER for the rated period April 18, 1978 to April 17, 1979. That defective OER was grossly prejudicial and had a substantial relationship to his passovers, in that he was not considered on the basis of a "fair and equitable" record of his military career in accord with former 10 U.S.C. § 3442(c). The ABCMR was obligated to correct those legal errors and injustices and put CPT Muse before a selection board for consideration on the basis of a *substantially complete and accurate record.* Its failure to do so, we hold, was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law.

THEREFORE, plaintiff's motion for summary judgment is GRANTED; defendant's cross-motion is DENIED; and the court orders as follows:

1. Muse shall be restored to active duty in the RA to the rank of Captain;

2. CPT Muse shall receive the back pay to which he was entitled as part and parcel of that office from the date of his involuntary and unlawful discharge from active duty on September 30, 1983;

3. The defective OER for the period April 18, 1978 through April 17, 1979, shall be deleted from plaintiff's records;

4. The period April 18, 1978 through April 17, 1979, shall be non-rated;

5. An appropriate explanation for the absence of this OER shall be placed in plaintiff's records; and

6. Any and all record of passovers to the rank of major shall be deleted from plaintiff's records.

7. Any and all additional relief as determined by the Secretary of the Army *and to which plaintiff is entitled, consistent with this opinion, and as required and permitted by law and regulations.*

Pursuant to 28 U.S.C. § 2507(a)[29] and RUSCC 34(d),[30] the Secretary of the Army *shall* calculate the amount of any and all back pay and other benefits to which CPT Muse is entitled consistent with this opinion from the date of his involuntary discharge on September 30, 1983 to the last day of the month in which said calculations are made. A copy of the detailed computations summarizing said determination (on a monthly and annual basis) shall be filed with the Clerk of this Court, with a copy in hand to counsel for plaintiff, *on or before December 18, 1990.* Time is of the essence; therefore, no motions for enlargements will be entertained. Upon receipt of same, and absent any substantial objections by the parties, the Clerk shall forthwith enter judgment accordingly. No costs.

IT IS SO ORDERED.

---

**29.** 28 U.S.C. § 2507(a) (1988) provides as follows:

> The United States Claims Court may call upon any department or agency of the United States or upon any party for any information or papers, not privileged, ... for use as evidence....

**30.** RUSCC 34(d) states in pertinent parts as follows:

> Calls. (1) *Issuance.* Pursuant to 28 U.S.C. § 2507(a), the court at any time (A) may call upon any department or agency of the United States for any information or papers it deems necessary to be filed with the clerk within a specified time, or
>
> (B) in any case appropriate for a computation by a department or agency of the United States, the court, upon the motion of a party or on its own motion, may issue a call for the computation. Within 30 days after the clerk has served notice of the filing of the computation, each party shall file with the clerk its acceptance or rejection of the computation. A rejection shall be accompanied by a statement of the reasons therefor.