Gerald ARENS, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 103–88C.

United States Claims Court.

Oct. 31, 1991.

Gerald Arens, pro se.[1]

John S. Groat, Dept. of Justice, Civil Div., Washington, D.C., for defendant.

## OPINION

HORN, Judge.

This case is before the court on defendant's Motion to Dismiss for Failure to State a Claim or, in the Alternative, for Summary Judgment and plaintiff's motion in response, which also asked for summary judgment in his favor.

In his amended complaint before this court, plaintiff, Gerald Arens, seeks all back-pay and allowances in the grade of Lieutenant Commander, for the period from July 1, 1983, the date of his involuntary retirement from the United States

Coast Guard (USCG), to the date of judgment. Furthermore, plaintiff requests that he be recalled to active duty, and reinstated to the active duty promotion list, that all records concerning his nonselection for promotion be voided, that a special promotion board to consider his promotion to the rank of Commander be convened, and that he be granted retroactive pay and benefits at the rank of Commander, if plaintiff is then selected for promotion by the special board. Plaintiff also requests attorney's fees and expenses.

The amended complaint filed in this court alleges that the BCMR: (1) failed to conduct a fair hearing, (2) failed to have a quorum present, (3) denied plaintiff the right of notice and cross-examination, (4) failed to consider the entire record, which plaintiff alleges demonstrated that plaintiff was denied a promotion following a retaliatory "blacklisting," (5) required plaintiff to meet an improper burden of proof, and (6) improperly denied plaintiff his statutory right to withdraw his application for correction. Both parties waived oral argument and asked the court to consider the case on the filings presented.

After a complete and thorough review of the pleadings submitted to the court by both parties, the defendant's partial Motion to Dismiss and defendant's Motion for Summary Judgment are GRANTED, and the motion of the plaintiff for summary judgment is DENIED.

## FACTS

On June 30, 1983, pursuant to 14 U.S.C. § 285 (1988), plaintiff was involuntarily retired from the USCG, after twice having been passed over for promotion to the rank of Commander by 1981 and 1982 promotion boards. Plaintiff filed two applications for correction with the Board for Correction of Military Records (BCMR), challenging his nonselection. Both promotion board determinations were appealed to one review board. Although the plaintiff had previously filed a complaint in the United States Claims Court, the proceedings before this

---

1. Although the plaintiff, Gerald Arens, filed his papers pro se, Mr. Arens is, in fact, an attorney.

court were stayed by agreement of the parties so that the BCMR could conduct an oral hearing and issue its decision. After conducting the special hearing, the BCMR denied relief to the applicant, Arens, on both applications. The BCMR's findings were committed to writing in an order titled Final Decision on Request for Reconsideration. After issuance of the BCMR's decision, the stay of proceedings in this court was lifted and the case in this court proceeded.

The plaintiff specifies four incidents which he alleges provided the impetus for an alleged conspiracy he believes was designed to retaliate against him by blacklisting him from promotion in the Coast Guard, and, thereby, causing his retirement.

First, according to Arens, on March 17, 1976, plaintiff, acting as a Flight Safety Officer (FSO), was approached by an enlisted man who was concerned that his Air Station Commanding Officer (CO) had a drinking problem and was flying while intoxicated. Plaintiff confronted the CO with these allegations, and the CO demanded the identity of the complainant. Maintaining an FSO's duty to protect sources of such communications, plaintiff refused. On April 6, 1976, plaintiff requested the assistance of Captain William J. Tillo, the 9th Coast Guard District Safety Officer, to help address the concerns stemming from the allegations made against the CO. As a result of Captain Tillo's intervention, plaintiff was accused of subversion and insubordination by the CO.

The second incident alleged by plaintiff to have caused his problems resulted from a request by plaintiff's wife for a congressional inquiry regarding the medical status of a Lieutenant David Zazzali. Lieutenant Zazzali was a pilot assigned, in 1978, to develop a protective shelter to safeguard helicopters from the adverse effects of the climate in the North Pacific Ocean, Bering Sea and Gulf of Alaska. In December, 1979, Lieutenant Zazzali went to his CO, not the same individual as the CO above,

expressing concerns over the unsafe conditions in the area. The CO requested that Lieutenant Zazzali undergo a medical examination. The exam found no evidence of any psychiatric disorder or physical malady which would prevent Lieutenant Zazzali from properly performing his duties. Lieutenant Zazzali reasserted his fears for safety conditions in a letter to the Commandant of the USCG. Eventually, he refused to continue with his assigned duties due to his concerns. As a result of this letter, the Commandant recommended that Lieutenant Zazzali's flight status be terminated.

In an administrative determination, Lieutenant Zazzali's flight status was removed due to what the Office Personnel Division and Office of Operations deemed his "fear of flying." Lieutenant Zazzali vehemently denied the "fear of flying" determination and appealed to the BCMR. The reviewing board found that there was no basis for the "fear of flying" finding. Captain Albert Tingley, however, responding on behalf of the Commandant, denied any relief to Lieutenant Zazzali and reiterated the Commandant's position that the Lieutenant's flight status be terminated.

In response to the Commandant's handling of the situation, plaintiff's wife wrote an undated letter to Admiral J.B. Hayes requesting a congressional inquiry into the Zazzali affair. Admiral Hayes ordered an investigation, which revealed that the administrative "fear of flying" determination violated Coast Guard procedure. Plaintiff alleges that his wife's request for a congressional inquiry into the Coast Guard's handling of the Zazzali matter was one of the motives for the Coast Guard's actions to blacklist him, not to promote him, and to end his Coast Guard tenure.

The third incident alleged by plaintiff to have impacted negatively on plaintiff's career involved two officers, Captain Bob Melvin and Captain Lance Eagan, each of whom eventually served on one of the two promotion boards which considered plaintiff's promotion.[2] In his duty as FSO, and

---

**2.** Captain Melvin served on the 1981 promotion board. Captain Eagan served on the 1982 pro-

motion board. During the years 1981–1982, Ea-

prior to the convening of the 1981 promotion board, plaintiff had occasion to separately counsel Captain Melvin and Captain Eagan on their possible use of alcohol while on duty. Plaintiff contends that from his consultations with Captains Melvin and Eagan, the officers took away a personal animus against plaintiff, which was manifested in the two, negative promotion board decisions.

The fourth incident which plaintiff alleges caused him harm occurred in 1981. On November 14, 1981, Captain Frank W. Olson was killed in a Coast Guard helicopter accident. The Toxicology Examination of Captain Olson indicated that Captain Olson had been piloting his helicopter while intoxicated. Plaintiff brought this information to the attention of the Commandant, who, nonetheless, posthumously awarded Captain Olson the Distinguished Flying Cross. Plaintiff characterized the presentation of the award to Olson as a "fraudulent awarding," and in his prayer for relief in the instant lawsuit, plaintiff Arens asks this court to order the revocation of the Distinguished Flying Cross to Captain Olson. In response to plaintiff's conduct regarding the Distinguished Flying Cross, Captain Carney, Deputy Chief of the Congressional Affairs Staff, criticized plaintiff for "malign[ing] the reputation of a courageous Coast Guard Officer."

After the original complaint was filed, the court was requested by both parties to stay the proceedings in the United States Claims Court in order to enable the Coast Guard Board for Correction of Military Records to conduct a special, evidentiary hearing regarding plaintiff's allegations. At the special hearing before the BCMR, plaintiff presented evidence which he alleged proved the existence of the alleged conspiracy to expel him from the Coast Guard. First, plaintiff introduced a photocopy of a route slip requesting a draft response from the Office of Personnel to a letter from plaintiff's wife (Ms. McHenry) regarding Lieutenant Zazzali's concern on aviation safety, with the handwritten notation in the remarks section "Blacklist Argan and Melvin both held the rank of Com-

ens," which was initialed at the bottom "GEO". Plaintiff argued that this message and the initials were written by Captain George Roy (Retired), who was then serving as Deputy Chief of Staff to the Commandant. Plaintiff asserted that this memo demonstrated initiation of the conspiracy against him, in response to his wife's letter, which had requested a congressional inquiry into the Zazzali affair.

Upon taking the stand at the BCMR special hearing, Captain Roy admitted that the note looked like his handwriting, but he did not recollect writing this note or to whom he would have written it. He conjectured that if he had, maybe he was being a "wiseacre." He denied participating in, or knowing of, any conspiracy to blacklist plaintiff. He also maintained that he had never joined in, or heard of, any conspiracy against Arens, and that he really did not know much about the plaintiff, although he readily stated that he regretted the remark. Moreover, Captain Roy testified emphatically that there is and was no blacklist in the Coast Guard and that "I meant no personal harm to a man I didn't even know."

The BCMR concluded that while Captain Roy's conduct was "highly improper," the evidence was insufficient to establish that the memorandum proved the existence of an actual conspiracy against plaintiff. First, according to the BCMR, there was no indication for whom the memo was intended. Also, the BCMR pointed out that plaintiff failed to present any evidence as to who, if anyone, even saw the note. Finally, the BCMR concluded that plaintiff failed to demonstrate that anyone, in particular Captain Tingley, took actions based on the "Blacklist Arens" memo.

Next, the BCMR considered a draft of a letter responding to the inquiry by plaintiff's wife's, Ms. McHenry, into the Coast Guard's reasons for terminating Lieutenant Zazzali's flight status. The draft, marked "For Official Use Only," expressly detailed the reasons for Zazzali's discharge. Apparently, the reviewing Coast Guard administrator felt too much was disclosed in

mander.

the draft letter, because in the margins were written the words: "Do we wish or need to expose these specifics? I don't think so! Ltr [sic] is far too long & sounds very defensive. Who, by the way is Ms. McHenry & how did she get wind of this?"[3] Plaintiff alleges that these marginal notes were written by Captain Roy, prior to his "Blacklist Arens" note. There were no marks denoting the identity of the reviewer. The BCMR concluded, however, that this letter and the marginal notes, while they may provide a context for Captain Roy's "Blacklist Arens" note, did not demonstrate a causal nexus between the letter and any specific conspiratorial action against the plaintiff, Arens, taken by any individual associated with the Coast Guard.

Plaintiff also claimed that the Coast Guard effectively "stacked" the 1981 and 1982 promotion boards against him by including Captain Robert Melvin as a member on the 1981 promotion board and Captain Lance Eagan as a member of the 1982 promotion board. Plaintiff introduced a memo, signed by GEO, addressed to Captain Tingley, dated "7/23"[4] with the word "Board" as the heading followed by the names "Bob Melvin" and "Lance Eagan." Plaintiff asserted this note demonstrates an effort by Captain Roy and Captain Tingley to stack the promotion board by recruiting members who had an alleged animus towards plaintiff. Arens asserted that because the Coast Guard could not retaliate against his wife, a civilian, they decided to end his career by twice having him fail to receive a promotion and, thereby, require his retirement.

Captain Roy testified that not only did he have no recollection of writing the memo, but he was totally uninvolved in the selection of the promotion board members. Furthermore, he only met Captain Melvin on the day of the hearing and he never recalled meeting Captain Eagan. More-

over, the BCMR found that there was no evidence presented that Captain Roy would have known of any animus that either Melvin or Eagan might have had and that there was no written record of any offers of counselling by plaintiff with either officer. He further asserted that prior to his retirement in 1981, he had no discussions with anyone concerning the composition of the 1981 and 1982 Commander promotion boards. He also vehemently denied any suggestions of a conspiracy against plaintiff with regard to the promotion boards.

Captain Tingley testified that while he was Chief of Officer Personnel from 1978 to 1980, and was involved in the selection of promotion boards, he never discussed or participated in any conspiracy to "blacklist" an applicant, and that he never met the plaintiff and had not been involved with the plaintiff. Presented with the "7/23" memo, he testified that he had never seen the memo prior to the BCMR special hearing and that Captain Roy had no direct oversight over him. Furthermore, he stated that because the message was so vague and did not refer to any specific board, the memo gave him little indication as to its meaning. Moreover, Captain Tingley stated he had left Headquarters for a new position on July 15, 1980, over a week before the memo was even written.

At the BCMR hearing, Captain Melvin testified that prior to sitting on the 1981 Commander promotion board, he did not know plaintiff was an applicant to be considered by the Board. He expressly stated that he did not hold any personal animus against Arens and that prior to the 1981 promotion board, he had not formed any particular opinion of the plaintiff, his record, or his performance. Furthermore, he emphasized that he never had any communications with Captain Roy concerning the plaintiff at any time, prior to the promotion board convening or during the pro-

---

3. Apparently there were three versions of the draft response. One of the versions contained a paragraph which did not appear in the final version, which suggested plaintiff's wife ought to refrain from interfering in Coast Guard affairs, but the BCMR was concerned about the authenticity of this version of the letter. The

BCMR studied all the versions of the response, but found them to be inconclusive and not to be proof of a conspiracy.

4. It was established that the "7/23" memo was written on July 23, 1980.

motion board proceedings. Finally, there was no evidence that Captain Melvin was pressured to deny plaintiff a promotion. Captain Melvin further testified that the plaintiff was considered by the 1981 Commander selection board just like everyone else was evaluated, and that he, Captain Melvin, was not coerced, directed, urged, or otherwise influenced, by anyone regarding the plaintiff's status.

Because Captain Eagan was hospitalized at the time of the BCMR hearing, his signed and sworn affidavit was presented before the BCMR. At the hearing, plaintiff did not object to submission of the affidavit, as long as he would have the opportunity to rebut its contents. Captain Eagan stated in an affidavit submitted on November 18, 1988, that although he was involved in the decision to ground Lieutenant Zazzali, he did not know of Arens's role in the affair, nor was he aware of any connection between Arens and Zazzali until after plaintiff's retirement from the military. Moreover, Captain Eagan stated that his contact with plaintiff was slight before serving on the 1982 promotion board, and his overall impression of plaintiff was "positive, albeit somewhat vague and insubstantial," and "generally neutral." He stressed that during the selections process, only the records of the individual officers were considered and that the applicant, Arens, had been dealt with fairly and in accordance with the rules.

After the testimony had been received, but before the BCMR had issued its decision, the plaintiff, Arens, filed "Applicant's Reply to BCMR Request for Record Correction and Conditional Withdrawal of Application." Plaintiff asked to withdraw his application if the Coast Guard was allowed to file a Post–Hearing Brief, at least in part because plaintiff pointed to a false certification date, which the Coast Guard explained as a typographical error. Plaintiff also alleged that he had been threatened by Coast Guard counsel on the telephone to stop, or "big guns" would be brought to bear on the applicant. The Coast Guard counsel ultimately apologized for his intemperate remarks, but said they were irrelevant to the proceedings and op-posed the withdrawal. The Coast Guard opposed the withdrawal because of the considerable resources already expended on the case to date and noting that the action in the United States Claims Court was still pending. After evaluating the situation, the BCMR denied the applicant's request to withdraw.

The BCMR concluded that the plaintiff had failed to establish that the July 23, 1980 memo evidenced an attempt to stack the promotion boards or that there was any conspiracy. The board determined that even weighing the evidence in the light most favorable to plaintiff, there was no showing of impropriety in the selection process and that the evidence presented did not establish either the existence of a conspiracy to retaliate against him to deny plaintiff a promotion or to retaliate against him by forcing him out of the Coast Guard. Plaintiff failed to prove that Captain Melvin or Captain Eagan harbored a personal resentment against him. Consequently, the BCMR held that there were no grounds for reversing the findings of either the 1981 or 1982 promotion boards.

## DISCUSSION

In his amended complaint, the plaintiff, Arens, requests the court to order that he be recalled to active duty and reinstated to the active duty list. Yet, during the proceedings before the BCMR, the plaintiff indicated that he did not want to return to active duty in the Coast Guard. The BCMR, in fact, in its Final Decision, wrote:

Furthermore, the case is moot because the applicant does not want to return to the Coast Guard. Unless the applicant were willing to return to active duty for further consideration by commander selection boards, there is no substantive relief for the Board to grant, were it inclined to grant relief.... The Coast Guard did conduct an informal investigation of the alleged "blacklisting." At this time, no purpose would be served by a further investigation, even [sic] it were within the Board's jurisdiction to order such an investigation.

■ This court believes it should give great deference to the military when reviewing matters which impinge upon military affairs and national defense. *Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 539–40, 97 L.Ed. 842, *reh'g denied*, 345 U.S. 931, 73 S.Ct. 779, 97 L.Ed. 1360 (1953). This court does not understand the role of the court to be to order promotions or to substitute its judgment for that of the military in the area of personnel matters, absent a clear violation of the Constitution or applicable law which mandates the promotion. *Orloff v. Willoughby*, 345 U.S. at 90, 73 S.Ct. at 538; *Voge v. United States*, 844 F.2d 776, 783 (Fed.Cir.1988), *cert. denied*, 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988). The Constitution rests the power of appointment (and, therefore, also the authority to promote) in the appropriate military officials within the Executive Branch of government, not in the Judicial Branch. *Orloff v. Willoughby*, 345 U.S. at 90, 73 S.Ct. at 538; *Maier v. Orr*, 754 F.2d 973, 983, *reh'g denied*, 758 F.2d 1578 (Fed.Cir.1985).

■ Having been passed over twice for promotion, the plaintiff, Arens, was involuntarily retired from the Coast Guard in accordance with 14 U.S.C. § 285.[5] In this action, plaintiff Arens has not contested his retirement pursuant to 14 U.S.C. § 285, but, rather, has contested the propriety of denying him a promotion by two separate promotion boards. Therefore, this court finds that, pursuant to Rule 12(b) of the Rules of the United States Claims Court (RUSCC), the plaintiff's requests to be recalled to active duty and to be reinstated to the active duty promotion list should be dismissed, as the defendant has requested.

■ This court does not have the authority to entertain the plaintiff's request that the Distinguished Flying Cross awarded to Captain Olson be revoked. As clearly stated by the United States Supreme Court in *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835, *reh'g denied*, 492 U.S. 932, 110 S.Ct. 11, 106 L.Ed.2d 626 (1989):

> All agree that '[i]t is a principle of general application in anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.' ... (Citations omitted.) This rule is part of our 'deep-rooted historic tradition that everyone should have his own day in court.' 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4449, p. 417 (1981) (18 Wright). A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings.

The BCMR also stated in its Final Decision: "the applicant's request for the rescission of the posthumous Distinguished Flying Cross is beyond this Board's jurisdiction." Therefore, pursuant to Rule 12(b) of RUSCC, this court dismisses plaintiff Arens' request to revoke the Distinguished Flying Cross awarded to Captain Olson, who is not a party to the instant litigation before this court.

■ Pursuant to 28 U.S.C. § 1491 (1988),[6] the United States Claims Court has

---

5. 14 U.S.C. § 285 states:
   Each officer of the Regular Coast Guard serving in the grade of lieutenant commander or commander, who has failed of selection for promotion to the grade of commander or captain, respectively, for the second time shall:
   (1) if he has completed at least 20 years of active service or is eligible for retirement under any law on June 30 of the promotion year in which his second failure of selection occurs, be retired on that date; or
   (2) if ineligible for retirement on the date specified in clause (1) be retained on active duty and retired on the last day of the month in which he completes twenty years of active

service, unless earlier removed under another provision of law.

6. 28 U.S.C. § 1491(a) reads as follows:
   (1) The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department....
   (2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in

jurisdiction to render judgment upon plaintiff's remaining claims. *Sargisson v. United States,* 913 F.2d 918, 920 (Fed.Cir.1990); *Sanders v. United States,* 594 F.2d 804, 810, 219 Ct.Cl. 285, 296 (1979).

■ To dispose of the balance of plaintiff's case, the defendant has moved for summary judgment and the plaintiff, Arens, also has requested summary judgment. The summary judgment procedure in the United States Claims Court is authorized by RUSCC 56.[7] Summary judgment is a method for disposing of all or parts of an action, if there are no material facts in dispute. In cases such as the instant one, which challenge the decisions of the BCMR, absent unusual circumstances, the court's review is generally limited to the proceedings before the BCMR, the record developed by the BCMR and the findings of the BCMR. *See Long v. United States,* 12 Cl.Ct. 174, 175 (1987). In the instant case, the parties agree that the record of the administrative proceedings, as filed, presents no facts in dispute and that the instant case is ripe for disposition by a motion for summary judgment.

■ For this court to overturn the decisions of the BCMR, the plaintiff has the burden of proving by clear and convincing evidence that the BCMR acted arbitrarily and capriciously, in bad faith, without a rational basis, or based its decision on an erroneous fact, or acted contrary to law, regulations or mandatory published procedure, by which plaintiff has been seriously prejudiced and money is due. *Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed.Cir.1986), *cert. denied,* 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986); *Curry v. United States,* 609 F.2d 980, 983, 221 Ct.Cl. 741, 746 (1979); *Guy v. United States,* 608 F.2d 867, 870, 221 Ct.Cl. 427, 433 (1979); *Skinner v. United States,* 594 F.2d 824, 830, 219 Ct.Cl. 322, 333 (1979); *Sanders v. United States,* 594 F.2d at 811, 219 Ct.Cl. at 298; *Armstrong v. United States,* 205 Ct.

Cl. 754, 761 (1974). Consequently, this court should uphold an agency's determinations in military nonselection cases unless they are arbitrary, capricious, unsupported by substantial evidence or contrary to applicable laws and regulations and published guidelines. *Muse v. United States,* 21 Cl. Ct. 592, 601 (1990) (citations omitted); *Moore v. United States,* 5 Cl.Ct. 457, 459 (1984).

■ While the court may disagree with a correction board as to whether or not a specific individual should have been promoted, it should not substitute its judgment for that of the Board when reasonable minds could reach differing conclusions. *Sanders v. United States,* 219 Ct. Cl. at 302, 594 F.2d at 813 (citing *Snell v. United States,* 168 Ct.Cl. 219, 227 (1964)). When contesting particular personnel actions taken by members of the Armed Forces, a plaintiff has a difficult burden and must overcome the "strong but rebuttable presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Sanders v. United States,* 594 F.2d at 813, 219 Ct.Cl. at 302; *Guy v. United States,* 608 F.2d at 870, 221 Ct.Cl. at 433; *Hary v. United States,* 618 F.2d 704, 707, 223 Ct.Cl. 10, 17 (1980); *Muse,* 21 Cl.Ct. at 602.

■ Thus, in order to prevail, the plaintiff in the instant case would have to demonstrate from the record that those officials who ruled on plaintiff's status while he was in the Coast Guard violated the applicable standards of law or acted arbitrarily, capriciously, in bad faith or without a rational basis. As long as the record before the BCMR supports its findings and conclusions, the court should generally defer to the decision of the BCMR, which is entitled to the presumption that it properly exercised its discretion. This court should also defer to the findings of the BCMR because when it reviewed Ar-

---

appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States....

7. Since RUSCC 56(c) is closely patterned upon Fed.R.Civ.P. 56(c), precedent under the Fed. R.Civ.P. is relevant to interpreting RUSCC 56(c). *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl. Ct. 67, 70 (1989).

ens' military record, it had the opportunity to observe the plaintiff's demeanor and make credibility determinations upon that basis. *See Anderson v. Bessemer City,* 470 U.S. 564, 575–76, 105 S.Ct. 1504, 1512–13, 84 L.Ed.2d 518 (1985); *Hambsch v. Department of Treasury,* 796 F.2d 430, 436 (Fed.Cir.1986) (stating that the presiding official's credibility determinations are "virtually unreviewable"). Moreover, beyond a mere showing of improper action by the BCMR, the plaintiff must also show that any error or injustice which may have occurred was to the detriment of the plaintiff. As stated in *Hary v. United States,* 618 F.2d 704, 709, 223 Ct.Cl. 10, 20 (1980), "Harmless error, unrelated to an officer's nonselection, will not warrant judicial relief."

■ Plaintiff's central contention in his dispute with the Coast Guard appears to be that he firmly believes that the BCMR's Final Decision, which found no conspiracy regarding his two non-selections, was arbitrary and without a reasonable basis in the evidence. The BCMR's determinations that they could identify no conspiracy in plaintiff's evidence, including the "Blacklist Arens" note, the drafts of the letter addressed to plaintiff's wife, Ms. McHenry, and the July 23, 1980 memo, are all reasonable, based on the evidence presented at the BCMR special hearing. In the Findings and Conclusions section of its decision, the BCMR indicated that it had interpreted the facts in the light most favorable to the applicant. The Board did express some concern that some of the written exhibits, such as the marginal notes and the draft letters, did raise serious issues of Coast Guard propriety. However, although the BCMR found that the notation by Captain Roy was "highly improper and should not have been made," they also indicated that "there is no indication for whom the notation was intended and no indication as to who might have seen it." The plaintiff failed to establish to whom the note was addressed, whether anyone saw the note, and most important, whether anyone acted based on having read the note. Consequently, this court agrees that the existence of the note, and the notation, albeit

inappropriate, falls short of proving actual conspiratorial conduct on the part of the Coast Guard or the group of individuals, in addition to Captain Roy, which plaintiff accuses of having conspired against him.

The BCMR also reasonably concluded that the margin notes in the proposed draft of the letter addressed to plaintiff's wife, Ms. McHenry, were not evidence of an orchestrated plan to "blacklist" plaintiff. Plaintiff failed to establish any connection between the comments and an attempt to expel plaintiff from the Coast Guard. In its Opinion, the BCMR stated:

> Captain Roy's influence, if any, did not extend beyond his retirement to the composition of two selection boards, and the outcome of those selection boards. The 1981 board met 14 months later and the 1982 board met 26 months later than the date of the memorandum. It is inconceivable that Captain Roy's influence could reach so far into the future. Moreover, the alleged recipient of the July 23, 1980, memorandum, had already left Headquarters. The Board considers it unlikely that he ever received this note."

This court agrees that based on the evidence proffered before the Board, the BCMR's conclusions regarding Captain Roy's comments were not arbitrary and capricious and should be sustained.

■ Moreover, based on the record presented, the BCMR also acted reasonably when it concluded that the 1981 and 1982 promotion boards were properly formed. No clear, convincing evidence was presented that the July 23, 1980 memo was actually intended to be an instruction from Captain Roy to Captain Tingley to select Captains Eagan and Melvin for the promotion boards. The memo does not specifically refer to the promotion boards. In fact, the BCMR noted that Captain Tingley had testified that his role in choosing selection board members was tangential. And, finally, Captain Tingley, the intended addressee, had left the Office of Personnel before the memo was drafted.

The BCMR also found no evidence that either Captain Melvin or Captain Eagan,

who sat on the 1981 and 1982 selection boards, had demonstrated any personal animus towards plaintiff. Although plaintiff claimed that the negative feelings towards him stemmed from his role as a counsellor who had made previous offers of assistance to the two Captains, the applicant, Arens, had actually indicated that there were no written official records of his previous offers of counselling. Moreover, the BCMR found that the record does not establish that either Captain Melvin or Captain Eagan had a personal animus against the plaintiff. Captain Melvin testified that he did not know that plaintiff was to be considered for promotion until after he became a member of the 1981 promotion board and that he did not hold any personal animus towards the defendant. In addition, Captain Eagan, in a sworn affidavit, even stated that he had a vague, but positive, impression of the plaintiff before he sat on the Board.

Plaintiff points out that he was passed over, despite a performance index above the mean for other officers who were promoted. He argues that this discrepancy alone is evidence of the existence of a conspiracy against him.[8] The plaintiff fails to consider that the performance index is only one part of the record the promotion board considers in its analysis. As the government points out, the promotion boards also consider other factors such as letters of recommendation, career patterns, experience, and other significant accomplishments. There is a strong presumption that members of a promotion board have fairly evaluated all the data presented to them when considering military personnel for promotion. Based on the evidence in the record, and given the absence of any compelling evidence to the contrary, the BCMR found that the evidence presented does not establish any plan or conspiracy to deny Arens a promotion and to then force him out of the Coast Guard. Moreover, the BCMR held that the 1981 and 1982 promotion boards were fairly constituted, that they each conducted proper proceedings and that both arrived at reasonable decisions which were not arbitrary, capricious and against the law. Based on the evidence presented, this court agrees.

Plaintiff argues it was not his burden to prove the existence of a conspiracy, and the BCMR was incorrect in requiring this from him. Clearly, plaintiff misunderstands his burden of proof at the hearing. As discussed more fully above, officers claiming that they have been improperly passed over for promotion, must first show that the Coast Guard committed an error which resulted in an injustice. In other words, the burden was on Arens at the BCMR hearing to prove the existence of a reversible error. In this case, the burden was on the plaintiff to prove the existence of the alleged conspiracy and to establish clearly in the record that he was improperly treated. The BCMR was correct to require as much.

In the instant case, plaintiff has raised a number of additional allegations in which plaintiff contends that Coast Guard officials, and then the BCMR, acted to deprive him of his rights due to inadequate procedural correctness. Plaintiff argues generally that he was prejudiced when the BCMR failed to apply the equitable doctrine of "laches" and apply his interpretation of 33 C.F.R. § 52.30-5(a) (1990), to estop the Coast Guard from asserting a defense which relied on "lost/destroyed evidence and faded memories" and that the Board violated its "fair hearing" duty. Plaintiff alleges that the Commandant deliberately delayed an investigation into the blacklisting allegations, and, further, denied plaintiff access to needed documents. Although, pursuant to 33 C.F.R. § 52.30-5(a), the BCMR, indeed, is required to conduct the hearing "as to ensure a full and fair presentation of the evidence," plaintiff's arguments are without merit.

The doctrine of laches is an equitable doctrine which, traditionally, is used to preclude a plaintiff from asserting a stale claim when his or her own unreasonable delay in commencing an action prejudices the defendant. Plaintiff's attempted

---

**8.** The plaintiff bases his statistical analysis upon data taken from a report issued by the 1979 Coast Guard Headquarters Fitness Report Study Group.

reliance on the doctrine of laches is misplaced. In the Claims Court, laches is an affirmative defense to be invoked by the defendant. It is, however, the plaintiff, Arens, who is attempting to assert the laches defense in the instant case. *See Murphy v. United States,* 16 Cl.Ct. 385, 391 (1989); *Wilmot v. United States,* 205 Ct.Cl. 666, 685 (1974). *See generally* D.B. Dobbs, *Remedies: Damages—Equity—Restitution* § 2.3 (1973).

■ Plaintiff may have been trying to invoke a doctrine of waiver or equitable estoppel. However, the doctrine of estoppel is also inapplicable in the instant case. *See generally* D.B. Dobbs, *Remedies: Damages—Equity—Restitution* § 2.3 (1973). In order to invoke the principle of estoppel, several important elements must be present: incorrect information, known to be incorrect, is communicated in a misleading way, either by words, conduct or silence, there is reliance on the communication and the other party would be harmed materially if the communicator is allowed to assert any claim inconsistent with the earlier conduct. *See Heckler v. Community Health Services,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984).

■ In this case, plaintiff has proffered no convincing evidence to support his allegation that any of the decision makers in the Coast Guard purposely withheld relevant evidence or delayed an investigation to improve the Coast Guard's case, nor is there sufficient evidence to document a conspiracy to deprive plaintiff, Arens, of his rights and privileges while he was in the military or during the time he was prosecuting his appeals. Furthermore, there is no clear evidence in this case that any of the decision makers, when they acted on his file in the two promotion boards or in the BCMR, relied on any of the items of evidence offered, which plaintiff claims documented the conspiracy to deprive him of a promotion or to end his military career.

■ Plaintiff also contends that the BCMR lacked "jurisdiction" under 33 C.F.R. § 52.05–1(a) (1988) because one member of the board, James P. Moore, who

sat through the oral argument, left the Department of Transportation after the special hearing, before the decision was issued. Plaintiff, however, has misread the relevant regulatory section. Pursuant to 33 C.F.R. § 52.05–1(b), "[a] Board consists of three members, and two members present constitute a quorum of the Board." Therefore, because two members of the BCMR were present at all times, and the Final Decision on Request for Reconsideration, when it was issued by the BCMR, was signed by two members, the BCMR had a quorum at all times and had the authority to rule on plaintiff's application for correction of his military records and on his request for reconsideration.

■ Plaintiff next asserts that he was not provided adequate notice of the issues and the witnesses prior to the BCMR hearing. On August 5, 1988, plaintiff was given notice that the BCMR hearing would take place on October 5, 1988. Plaintiff charges, however, that it was improper for the BCMR to accept the Coast Guard's "Notice of Appearance and Procedural Motions," which was dated September 23, 1988, but which he claimed he received seven days prior to the hearing date. According to plaintiff's interpretation, 33 C.F.R. § 52.20–10 (1988) requires that all motions must be submitted thirty days prior to the hearing date. This is an incorrect reading of the regulation. Instead, § 52.-20–10 requires that an applicant be notified in writing that a hearing date has been granted upon receipt of "all briefs, memoranda, or other documents," and further states that:

[t]he date of the hearing may not be less than 30 days from the date of transmission of the written notice thereof, except that an earlier date may be set when the applicant waives his right to such 30 days' notice in writing and has actual notice of the time and place of the hearing.

33 C.F.R. § 52.20–10. The purpose of the regulation is to give applicants adequate notice of the hearing and not to require, as plaintiff's reading would mandate, revising the hearing date every time a party files a

pre-hearing motion or other writing. Thus, this court finds that plaintiff was provided adequate notice under the applicable standards.

Plaintiff further contends that he was denied the opportunity to cross-examine Captains Melvin and Eagan during the BCMR proceedings. Although the Board's deliberative process was considered privileged under 14 U.S.C. § 261(d) (1988), as the government correctly points out, plaintiff actually did cross-examine Captain Melvin at the BCMR special hearing. As for Captain Eagan, due to his hospitalization, he was unable to testify at the BCMR hearing. Instead, the government was allowed to submit Captain Eagan's signed and sworn affidavit. However, before an affidavit was considered an acceptable alternative to live testimony, together with an opportunity to conduct cross-examination of the witness in person, the plaintiff was informed that Captain Eagan was hospitalized and the plaintiff was asked if he had any objections to admitting Captain Eagan's testimony in the form of a sworn to affidavit. Plaintiff responded on the record that he had no objection, provided he would have an opportunity to rebut. Consequently, in the BCMR's Post–Hearing Order, dated November 4, 1988, as requested by the plaintiff, the court afforded defendant an opportunity to submit the affidavit of Captain Eagan and afforded the plaintiff the option to request an opportunity to respond to the affidavit. Therefore, because plaintiff waived any objection to the admission of the affidavit, and because he was given the opportunity to present rebuttal testimony, but, as pointed out in the BCMR Final Decision, did not do so, plaintiff cannot now challenge the board's consideration of the testimony offered by Captain Eagan. Likewise, his rights regarding cross-examination were not violated with respect to Captain Melvin because he did, in fact, exercise his right to cross-examine Captain Melvin at the hearing before the BCMR.

Plaintiff also asserts that he attempted to withdraw his BCMR application because he felt he and his family were being intimidated. Plaintiff claims that it was not within the BCMR's discretion to deny the request to withdraw his BCMR application, and that the BCMR improperly refused to do so. In support of his argument, he cites to 33 C.F.R. § 52.30–25 (1988), which provides:

The Board shall permit the applicant to withdraw his application at any time before a final determination by the Secretary. Any further consideration by the Board of the issues raised in the withdrawn application shall be given only upon a showing of good cause.

33 C.F.R. § 52.30–25. Although the record establishes that a member of the Coast Guard counsel's office did make some intemperate remarks, for which he subsequently apologized, the BCMR refused to allow the withdrawal, relying on the "good cause" exception in the regulation to continue the proceedings. In its Final Decision, the BCMR concluded that the Coast Guard:

... has shown good cause for the Board's continued consideration of the issues raised and for resolving those issues in a decision. The Coast Guard has expended considerable resources of time and effort in finding, preparing and transporting witnesses for the October 5 hearing, in participating in the hearing and in preparing arguments, motions, answers and a post-hearing brief.

The Board also cited to the lawsuit which was still pending in this court and which had been stayed pending a decision by the Board, pursuant to the agreement between plaintiff and government counsel.

## CONCLUSION

For the foregoing reasons, defendant's Motion to Dismiss and Motion for Summary Judgment are GRANTED; plaintiff's Cross-motion for Summary Judgment is DENIED. The Clerk of the Court is directed to enter judgment in accordance with the findings herein.

IT IS SO ORDERED.