Gerald F. ARENS, Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–Appellee.

No. 92–5032.

United States Court of Appeals, Federal Circuit.

July 8, 1992.

Rehearing Denied Sept. 16, 1992.

The Claims Court found that the Board for Correction of Military Records (BCMR or Board) properly had jurisdiction over Mr. Arens' claims, that the promotion boards whose decisions directly resulted in Mr. Arens' involuntary retirement were properly constituted, and that Mr. Arens had failed to establish the existence of the conspiracy which he alleged resulted in his involuntary retirement from the United States Coast Guard. This court vacates and remands.

Gerald F. Arens, pro se.

John S. Groat, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director.

Before NEWMAN, Circuit Judge, BENNETT, Senior Circuit Judge, and CLEVENGER, Circuit Judge.

MARION T. BENNETT, Senior Circuit Judge.

Mr. Gerald F. Arens appeals the judgment of the United States Claims Court, *Arens v. United States*, 24 Cl.Ct. 407 (1991). The Claims Court granted the United States' motions for summary judgment and for partial dismissal and denied Mr. Arens' motion for summary judgment.

## BACKGROUND

Mr. Arens, a Lieutenant Commander in the Coast Guard, was involuntarily retired from the Coast Guard on June 30, 1983, under 14 U.S.C. § 285 (1988) for having twice been passed over for promotion to the rank of Commander by promotion boards convened in 1981 and 1982.[1] Mr. Arens challenged his nonselection at the Board for Correction of Military Records (BCMR or Board), filing two applications for correction, and also filing an action in the Claims Court seeking back pay and other relief from the date of his involuntary retirement to the date of judgment. The parties agreed to stay the proceedings in the Claims Court so that the BCMR could conduct a special evidentiary hearing to explore Arens' allegations of a conspiracy against him.[2]

---

1. 14 U.S.C. § 285 states:
   Each officer of the Regular Coast Guard serving in the grade of lieutenant commander or commander, who has failed of selection for promotion to the grade of commander or captain, respectively, for the second time shall:
   (1) if he has completed at least 20 years of active service or is eligible for retirement under any law on June 30 of the promotion year in which his second failure of selection occurs, be retired on that date; or
   (2) if ineligible for retirement on the date specified in clause (1) be retained on active duty and retired on the last day of the month in which he completes twenty years of active service, unless earlier removed under another provision of law.

2. Mr. Arens alleges the existence of a retaliatory conspiracy against him based on the following circumstances:
   (1) in his capacity as Flight Safety Officer (FSO), Mr. Arens received allegations that the Air Station Commanding Officer (CO) had a drinking problem and allegations that the CO flew while intoxicated; Arens confronted the CO who demanded the source's identity which Arens protected; Arens sought assistance from the 9th Coast Guard District Safety Officer and was resultingly accused by his CO of subversion and insubordination;
   (2) Arens' wife (Ms. P.F. McHenry) wrote a letter critical of Coast Guard safety practices to Admiral J.B. Hayes in which she requested a congressional inquiry regarding the medical status of a Lieutenant David Zazzali, an officer who had expressed concern about unsafe conditions and had his flight status removed under the rubric of "fear of flying," which status was upheld; in response to the letter, Adm. Hayes ordered an investigation which revealed that the "fear of flying" determination as to Zazzali violated Coast Guard procedure; a route slip requesting a draft response to Ms. McHenry's letter from the Office of Personnel contained a handwritten notation "blacklist Arens," and was initialed "GEO,"

At the hearing, the Board heard evidence on the issue of the alleged conspiracy with Mr. Arens, an attorney, representing himself. After the hearing but before the Board issued a decision, on November 8, 1988, Mr. Arens filed a "Conditional Withdrawal of Application" asking to withdraw his application under 33 C.F.R. § 52.30–25 (1988)[3] if the Coast Guard was allowed to file a post-hearing brief. One week later, on November 14, 1988, Mr. Arens filed an "Unconditional Withdrawal of Application" after apparently receiving "threats" from the Coast Guard's counsel that he would bring "big guns" to bear on Mr. Arens, including calling Mr. Arens' employer, if he did not drop his action. The Coast Guard opposed the withdrawal, admitting and apologizing for its counsel's "intemperate remarks" to Mr. Arens and citing the considerable expenditure of time and resources which had already gone into this case as an argument against granting the withdrawal.

Accepting both the Coast Guard's argument and its interpretation of the withdrawal regulation, the BCMR denied the motion to withdraw the application and issued a Final Decision on Request for Reconsideration on the merits of Mr. Arens' claims on February 10, 1989. According to the Board's decision, included in the "Unconditional Withdrawal" document was a statement of Mr. Arens' intention that as a result of the "threats," he planned "to abandon the suit filed in the U.S. Claims Court."

The Board determined that the documentary evidence presented by Mr. Arens in the case raised, on its face, a "serious question of Coast Guard propriety" and found that Captain Roy had indeed written the "blacklist" notation and that he had written the "7/23 memorandum" which purported to assign Captains Melvin and Eagan to Arens' promotion boards. However, despite these findings, the board determined that no causal connection existed between the 7/23/80 memorandum and Arens' failure to be selected and further found that the "blacklist" notation proved to be inconclusive since there was no indication of an address or record of who might have seen it and because Captain Roy testified that no blacklist existed as to Arens, denying that the notation was an instruction to retaliate against Arens.

Determining overall that there was no impropriety in the composition or actions of the 1981 or 1982 promotion boards and no reason to disturb the boards' determinations with respect to Arens, the BCMR also found that "even weighing the evidence in the light most favorable to plaintiff, there was no showing of impropriety in the selection process and that the evidence present-

---

allegedly written by the Deputy Chief of Staff, Captain George Roy; a draft of Ms. McHenry's letter was also introduced as evidence which had responsive comments written in the margins, including "Do we wish or need to expose these specifics? I don't think so! Ltr is far too long & sounds very defensive. Who by the way is Ms. McHenry and how did she get wind of this?"; Arens alleged that these comments were also written by Captain Roy;
(3) In his duty as FSO, Arens separately counseled Captain Bob Melvin and Captain Lance Eagan on their possible use of alcohol while on duty; Arens maintains that both took personal animus toward him as a result of the counseling sessions; each of these officers served on one of the two promotion boards which considered plaintiff's promotions, leading to his allegation of stacking the promotion board with persons antagonistic to him—Melvin on the 1981 selection board and Eagan on the 1982 board; Arens submitted a memorandum dated 7/23/80 to the Chief of Officer Personnel stating "Board 1. Bob Melvin. 2. Lance Eagan" and was signed by "GEO, Deputy Chief of Staff"—again allegedly Captain George Roy—in support of his allegation of stacking the boards;
(4) In 1981, a Coast Guard helicopter pilot was killed in an accident and the toxicology examination indicated that the pilot had been flying while intoxicated; Arens brought this information to the attention of the Commandant who nonetheless posthumously awarded the pilot the Distinguished Flying Cross; Mr. Arens sought to have the award decision reversed based on the medical evidence.
*Arens v. United States*, 24 Cl.Ct. 407, 410–11 (1991).

**3.** This section states:
  The Board shall permit the applicant to withdraw his application at any time before a final determination by the Secretary. Any further consideration by the Board of the issues raised in the withdrawn application shall be given only upon a showing of good cause.

ed did not establish either the existence of a conspiracy to retaliate against him to deny plaintiff a promotion or to retaliate against him by forcing him out of the Coast Guard." The board thus denied relief to Arens on both applications after which the stay was lifted and the case proceeded in the Claims Court.

In the Claims Court, Arens sought back pay and allowances in the grade of Lieutenant Commander for the period from July 1, 1983 (his involuntary retirement) to the date of judgment, also seeking recall to active duty, reinstatement on the active duty promotion list, the voiding of all records concerning his nonselection, the convening of a special promotion board to consider his promotion to the rank of Commander, the grant of retroactive pay and benefits at the rank of Commander if he was selected for promotion by the special board, and the revocation of the Distinguished Flying Cross which was posthumously awarded to a deceased Coast Guard helicopter pilot, who Arens alleged was killed while flying under the influence of alcohol. Mr. Arens also requested attorneys fees and expenses. As the bases for his claims, Arens alleged that the BCMR failed to conduct a fair hearing, acted in the absence of a quorum, denied him the right of notice and cross-examination, failed to consider the entire record which he alleged demonstrated that his promotion denial was the result of retaliatory blacklisting, required him to meet an improper burden of proof, and improperly denied him the right to withdraw his correction application.

The Government moved to dismiss Mr. Arens' action on the grounds of a failure to state a claim or in the alternative for summary judgment. Arens then also moved for summary judgment. On October 31, 1991, the Claims Court issued a decision, giving great deference to the military, in which it granted the Government's partial motion to dismiss several issues, granted the Government's motion for summary judgment and denied Arens' motion for summary judgment. *Arens*, 24 Cl.Ct. 407.

## DISCUSSION

### Standard of Review

■ In reviewing the Claims Court's decision based on the judgment of a correction board, Mr. Arens bears the burden of demonstrating by cogent and clearly convincing evidence that the correction board acted arbitrarily, capriciously, contrary to law, or that its determination was unsupported by substantial evidence. *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed.Cir.) *cert. denied*, 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986). In other words, Mr. Arens must overcome the rebuttable presumption that, in this case, the "administrators of the military, like other public officers, discharge[d] their duties correctly, lawfully, and in good faith." *Sanders v. United States*, 594 F.2d 804, 813, 219 Ct.Cl. 285 (1979).

Further, in general, this court is cognizant of the deference to which the military is normally entitled in the governance of its affairs. *See Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953) ("[J]udges are not given the task of running the Army.... The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."); *Voge v. United States*, 844 F.2d 776, 782 (Fed.Cir.), *cert. denied*, 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988) ("[S]trong policies compel courts 'to allow the widest possible latitude to the armed services in their administration of personnel matters.' *Sanders v. United States*, 594 F.2d 804, 813, 219 Ct.Cl. 285 (1979)."). However, while in this case this court does not undertake to interfere in military affairs nor to unduly intervene in a military personnel matter, it does presume to correct an error of law.

### Withdrawal of Application

■ Mr. Arens maintains, *inter alia*, that the Claims Court erred when it upheld the Board's finding that it had jurisdiction over his claims. Arens argues that the

Board did not correctly have jurisdiction because it improperly rejected his request to withdraw his application under 33 C.F.R. § 52.30–25 and instead proceeded to a judgment on the merits, despite the regulation's mandatory language which, he charges, removes the discretion of the Board. The Government argues that the Claims Court correctly rejected Mr. Arens' allegation of error on this issue, stating that "the matter clearly was within the sound discretion of the board and LCDR Arens has alleged no facts to establish that the board abused its discretion in completing its adjudication." The Claims Court stated, on the withdrawal issue:

> Although the record establishes that a member of the Coast Guard counsel's office did make some intemperate remarks, for which he subsequently apologized, the BCMR refused to allow the withdrawal, relying on the "good cause" exception in the regulation to continue the proceedings. In its Final Decision, the BCMR concluded that the Coast Guard:
>
>> ... has shown good cause for the Board's continued consideration for the issues raised and for resolving those issues in a decision. The Coast Guard has expended considerable resources of time and effort in finding, preparing and transporting witnesses for the October 5 hearing, in participating in the hearing and in preparing arguments, motions, answers and a post-hearing brief.
>
> The Board also cited to the lawsuit which was still pending in this court and which had been stayed pending a decision by the Board, pursuant to the agreement between plaintiff and government counsel.

*Arens*, 24 Cl.Ct. at 419. The Claims Court failed to include in its analysis any language which is clearly dispositive of the withdrawal issue, only citing to and recounting what the Board had done and said. Obviously, the Claims Court could have and should have been more clear about its resolution of this issue, but regardless of that deficiency and despite the equities involved in this case, the Board and the Claims Court both, as a matter of law, misinterpreted and misapplied the withdrawal regulation, erroneously failing to permit Mr. Arens to withdraw his application.

The regulation at issue, 33 C.F.R. § 52.30–25, states:

> The Board shall permit the applicant to withdraw his application at any time before a final determination by the Secretary. Any further consideration by the Board of the issues raised in the withdrawn application shall be given only upon a showing of good cause.

The regulation states mandatorily that the Board *"shall"* permit the application to be withdrawn if such withdrawal can be accomplished before the Secretary's final determination on the application. As a result of the regulation's mandatory construction, the Government retains no discretion as to whether or not the withdrawal will or will not be granted.

The second sentence of the regulation qualifies the fact that the Board would not normally be able to consider issues raised in the application after the withdrawal but for "a showing of good cause." However, this clause also confirms the fact that the application *must* be allowed to be withdrawn ("Any further consideration of the issues raised in the *withdrawn application*...."). The regulation allows for a resumption of the application's consideration, upon the request of the party seeking further consideration, but only upon a showing of good cause for the Board to consider the issues raised in the now withdrawn application. Because the regulation is framed only in terms of the *applicant*'s actions it further seems clear that the "showing of good cause" clause of the regulation was intended for the use of the party who mistakenly or inadvertently withdraws his or her application and then subsequently seeks to have the Board revisit and finally adjudicate the issues raised therein.

The history of 33 C.F.R. § 52.30–25 provides evidence that the Coast Guard intended this regulation to be used solely by the withdrawing party and not by the agency.

The version of the regulation applicable in this case (Section 52.30–25 of Title 33) was enacted in the 1976 edition of the C.F.R. The version in effect before the 1976 amendment (33 C.F.R. § 52.20–25 (1975)) stated:

> The Board may, at its discretion and for good cause shown, permit an applicant to withdraw his application without prejudice at any time before its proceedings are submitted to the Secretary of the Treasury.

The distinctions between the 1975 and the 1976 versions are clear and obvious. The Coast Guard in the 1976 regulation intentionally changed the operative language from the previous discretionary "may" construction to the mandatory "shall" language. Further, the Coast Guard in amending the 1975 regulation deleted the good cause requirement from the application withdrawal clause and appended it to the clause allowing post-withdrawal further consideration of the application.

Clearly, the pre–1976 version of the regulation evidences the intent that the applicant was the only party to have a say in any further adjudication of issues which had been part of the withdrawn application. By designating the withdrawal as "without prejudice," the applicant could refile his or her application and no other party would be part of that procedure or be able to make arguments against such reconsideration. Viewed in light of this version of the regulation, the 1976 version's second sentence is ambiguous in that it does not specifically designate that the applicant is the only party who should be allowed to make a showing of good cause. However, from the intent of the pre–1976 version and subsequent versions of the regulation, the ambiguity can be resolved.

Most recently, in the 1991 edition of the C.F.R., the Coast Guard amended this same regulation (it is now found at 33 C.F.R. § 52.26) so that it now reads:

> The board may, in its discretion, permit the applicant to withdraw his or her application at any time before a final determination by the Secretary. Any further consideration by the Board of the issues raised in the withdrawn application shall occur only upon the filing of a new application.

The alterations are once again significant (changing "shall" back to "may, in its discretion" and changing the "further consideration" clause from a good cause standard back to requiring the filing of a new application for the Board to further consider issues related to the withdrawn application). The 1991 version of the regulation resembles the pre–1976 regulation in the discretionary standard and the ability to get further consideration of issues in the withdrawn application which rests solely and exclusively with the applicant. Those two regulations are similar while the version applicable in this case is clearly distinguishable—the Coast Guard apparently saw wisdom in reverting to the discretionary language of the pre–1976 regulation and to the necessity of filing a new application to get further consideration of issues that had been withdrawn (the "without prejudice" language of the pre–1976 regulation). The only way to equate the 1976 version and the pre–1976 and 1991 regulations is by arguing that "shall" equals "may." The Coast Guard is stuck for this case, with the 1976 version's mandatory construction, which in light of the other versions, was the result of a conscious decision.

Mr. Arens aptly states that if the intention of the regulation was to provide the agency with discretion regarding the withdrawal of applications, discretionary language would have been used. Under the regulation as it existed at the time of this case, Mr. Arens should have been able to withdraw his application as the regulation purported to allow him, in fact *mandated* ("shall") upon the party's request. Mr. Arens, in compliance with the terms of the regulation, sought withdrawal of his application before the Secretary had made a final determination of his claims.

The Claims Court erroneously allowed the Government to use the regulation to its own advantage. It is clear from the three regulations taken together that the intent of the Coast Guard with regard to the

"further consideration of the withdrawn application" clause was to make this option available only to the withdrawing party—the applicant—and not to the party opposing the withdrawal. Moreover, even if this court were to so liberally interpret the regulation so as to allow the Coast Guard to make the showing of good cause to enable continued evaluation of the application under the regulation, the Coast Guard's showing would have been insufficient here. Admittedly there are many equities at play in this case, not the least of which is the fact that the Government has indeed invested much time and effort and money in its action with Mr. Arens. However, the amount of time and resources expended by the Coast Guard does not outweigh Mr. Arens' right to have the applicable regulations interpreted and applied to him in a reasonable manner and in the manner in which the agency obviously intended.

As to whether Mr. Arens appreciated the significance of his withdrawal of his application, he stated in his brief "appellant thus elected to take the extreme step of abandoning his legal right to the BCMR process with full recognition that it could preclude the exhaustion of administrative remedies." Thus, it appears clear that Mr. Arens definitely understood the action he was taking. Further, although the Board relied upon the pendency of the Claims Court suit as one reason not to allow the withdrawal of Mr. Arens' application, Mr. Arens stated in his request for withdrawal that he would dismiss the Claims Court suit upon the withdrawal of his application. The Board, either somehow unaware of Mr. Arens' representation to this effect or for some reason disregarding it, relied on the Coast Guard's representations of the Claims Court suit's continued existence when it ruled that the Government had shown good cause for continuing to a judgment. The Coast Guard's reliance upon the continuation of the Claims Court action in its attempt to show good cause, in light of Mr. Arens' statement, appears to be disingenuous.

The Coast Guard has now amended the regulation, but the version of the regulation applicable to this case mandates that the Board should have allowed Mr. Arens to have withdrawn his application. The portion of the Claims Court's decision dealing with the application withdrawal is *not* supported by substantial evidence and the Board and the Claims Court erred as a matter of law ("acted contrary to law and regulations") in their interpretation of the regulation and its application to Mr. Arens.

## CONCLUSION

The legal error made by the Board and ratified by the Claims Court is pervasive to the history of this case. But for the Board's failure to allow Mr. Arens' correction application to be withdrawn, the Claims Court and this court would likely not have been involved in this case. Thus, this court vacates the Claims Court's grant of summary judgment and partial dismissal, making that judgment a nullity as it was entered based on an erroneous interpretation of the withdrawal regulation, and remands this case to the Claims Court with instructions that it vacate the Board's decision and order the Board, pursuant to 33 C.F.R. § 52.30–25 (1988), that Mr. Arens be allowed to withdraw his application, thus returning this case to the point in time when the Board should have granted Mr. Arens' Unconditional Withdrawal request. At this point, Mr. Arens, if he chooses to pursue his action, upon a showing of good cause as enunciated in the regulation, may attempt to prevail upon the Board to take up further consideration of his case, otherwise his administrative case may have voluntarily come to an end.

## COSTS AND ATTORNEY FEES

Each party shall bear its own costs and attorney fees.

**VACATED AND REMANDED.**